**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Num. 1:07-cr-00265-JCC-1 |
| | ) | |
| INGRID DINA LEVY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF INGRID DINA LEVY'S PRETRIAL MOTIONS**

Preliminary Statement

    This Memorandum of Law is respectfully submitted in support of Ingrid Dina Levy's

pre-trial motions for the following: (1) dismissing Counts One, Two and Three of the Indictment

as being unconstitutionally vague, duplicitous and multiplicitous; (2) dismissing Counts Four,

Five and Six of the Indictment as being unconstitutionally vague and multiplicitous; (3)

dismissing Counts 3 and 6 of the Indictment as being legally insufficient; (4) directing the

Government to file a Bill of Particulars, pursuant to Federal Rule of Criminal Procedure 7(f) in

the event Counts 1 through 6 are not dismissed; (5) striking surplusage from Counts 1 and 4 of

the Indictment pursuant to Federal Rule of Criminal Procedure 7(d); (6) precluding the

Government from admitting into evidence or otherwise utilizing any physical items recovered or

observed pursuant to a search warrant executed on defendant's home on or about December 19,

2006 for failure to disclose the warrant affidavit; (7) precluding the Government from admitting

into evidence or otherwise referring to a statement allegedly made by defendant to federal agents

during the execution of the above-referenced search warrant for failure to disclose the warrant

affidavit; (8) directing the Government to continue to turn over discovery; (9) directing the Government to instruct the agents to retain their handwritten notes; (10) directing the Government to disclose Brady material and (11) permitting the defendant to make additional motions.

In regard to the timing of these motions, defense counsel has been awaiting disclosure of the affidavit underlying the search warrant permitting the search of Ms. Levy's home for several months. According to the Government, despite the Government's efforts to unseal the affidavit in the Eastern District of New York, as of the date of these motions the affidavit has not been unsealed. Therefore, according to the Government, the United States Attorney's Office for the Eastern District of Virginia is unable to provide the affidavit to defendant's counsel because it remains sealed. Counsel for the defendant had intended to file pre-trial motions after receiving the affidavit so that any appropriate motion against the sufficiency or legality of the warrant affidavit could be included along with counsel's other motions. However, insofar as the trial date of January 15, 2008 is quickly approaching and given the fact that the Government appears to be no further along in unsealing the warrant affidavit and providing it to counsel, counsel thought it prudent to file the instant motions at this time.

The Indictment

The Indictment charges a total of six counts, broken essentially into two overarching schemes to defraud. Counts one, two and three relate to one fraudulent scheme, which took place between November 2004 and "late 2005." Counts four, five and six relate to a second scheme between January 2005 and "late 2006." Because the defendant is challenging the Indictment on the grounds of, among other things, duplicity, vagueness and surplusage, relevant

portions of the charging document will be set forth in considerable detail. The Indictment is attached hereto as Exhibit A.

      1.    <u>Counts One, Two and Three</u>

The first count, charging Wire Fraud, alleges that from November 2004 until late 2005, the defendant devised a scheme to defraud individuals "by either failing to deliver all fashion clothing items they ordered or failing to deliver any items at all and to obtain from these individuals money and property by means of materially false and fraudulent pretenses and representations." <u>See</u> <u>Indictment</u>, para. 8, page 4. The substantive allegations of the first three counts are contained in Count One under the heading "The Scheme and Artifice to Defraud." The alleged scheme is broken into two general parts. The first, comprising paragraphs 9 through 20, relate to a business alleged to have been started by Ashley Foster called WWW.RUNWAYRENEGADE.COM. The second, described in paragraphs 21 through 25, relates to WWW.BUBBLEPOPSHOP.COM.

As part of the scheme and artifice to defraud in Count One, the Government sets forth a wide variety of disconnected activity that is not alleged to have caused financial injury. Indeed, the victim of the alleged fraud is unclear. Certain allegations suggest that the victim is defendant's business partner, Ashley Foster. Yet, Count One also suggests that the victim is not defendant's business partner, but the individual customers who paid for clothing they did not receive. However, as to these victim-customers, it is not alleged that defendant made material, false statements to them. As a result, Count One is virtually incomprehensible.

In sum, the Government alleges in Count One that Ms. Levy made certain misrepresentations of inconsequential, non-material matters to her business partner, Ashley

Foster. However, there is no allegation that Ms. Foster was injured by these non-material misrepresentations. Indeed, the Indictment alleges that Ms. Foster profited from her clothing business with Ms. Levy and suffered no detriment from any alleged misrepresentations.

At its heart, the alleged fraud scheme in Count One appears to be driven by three purported misrepresentations. First, that the "defendant purported to be the owner of two high fashion retail stores…(and that)…the defendant sent AF (Ashley Foster) pictures that purported to be her store in New York." The Government claims this is a fraudulent representation because the "defendant… did not own brick and mortar clothing stores …at the time." See Indictment, para 10, pages 4 and 5. There is no allegation in the Indictment as to why such a misrepresentation, even if it was made, was in any way consequential to Ms. Foster or of how Ms. Foster may have been adversely affected by such a misrepresentation.

Second, the Government states that the "defendant claimed to AF (Ashley Foster) that she often had excess inventory from her purported retail stores purchased from legitimate suppliers that she needed to sell." The Government alleges this is a fraudulent representation because the defendant "was not an authorized distributor or reseller of any of the fashion lines that she purported to sell." See Indictment, para 11, page 5. The Indictment does not specify how if at all Ashley Foster was injured because of this alleged misrepresentation.

The third aspect of the scheme is that the "defendant purported to have a vast array of employees in her retail and online businesses…(and that)… the defendant pretended to be many different individuals and shielded her identity from those whom she hoped to defraud." The indictment does not specify to whom defendant pretended to be someone else, or to whom she purported to have a vast array of employees, or even "whom she hoped to defraud."

Count One then describes defendant's and Ms. Foster's clothing business. Specifically, it alleges that the "victim," Ashley Foster, would collect payments from the buyer of the merchandise, would mail the defendant an agreed-upon amount, and defendant would then drop-ship the merchandise directly to the customer. However, the count alleges that "it was part of the scheme and artifice to defraud that the defendant would <u>often make</u> partial shipments or ship alternate goods…" <u>Indictment</u>, para. 13, pages 5 and 6 (emphasis added).

Count one alleges further than on or about December 22, 2004, two customers – CP and CG – "placed an order with AF (Ashley Foster) for 200 'Juicy Girls Designer Products' with a sales price of $10,000." It specifies that CP made a wire transfer of the $10,000 sum to Ashley Foster's Virginia bank account, and that Ashley Foster kept 20% ($2,000) and mailed a BB&T "official check" in the amount of $8,000 payable to "Dina Lev" to the residence of the defendant in Brooklyn, New York. It is alleges that "when customers CP and CG did not receive their order from the defendant, they complained to AF through a number of e-mails (and that) AF then consulted with the defendant about the order." The Government then alleges that "(a)s part of the defendant's scheme, the defendant offered to deal directly with customers in a January 25, 2005 e-mail…" <u>Indictment,</u> para. 16, page 6.

Based on paragraphs 10, 11 and 12, therefore, it appears that the "victim" of the defendant's alleged fraud is her business partner, Ashley Foster. However, in paragraph 16, Ashley Foster is alleged to have profited from the allegedly fraudulent transaction in the amount of 20% of the $10,000 and derived the further benefit of not having to address the complaints of the customers CP and CG. So, the count fails to allege that Ms. Foster was adversely affected by

any of these events. On the contrary, the Indictment indicates that Ashley Foster expected, and received, a pre-arranged percentage of money from her business dealings with Ms. Levy.

So, instead of alleging a fraud on defendant's business partner, as set forth earlier in Count One, paragraph 16 alleges, if anything, that the two customers were victimized by some unstated fraud. However, there is no alleged misrepresentation to them set forth anywhere in the Indictment. So, it is unclear what the defendant is supposed to have done or said to have either defrauded Ashley Foster, who enjoyed a profit from this transaction, or either of the two customers. As a result, the defendant lacks notice of what is being charged.

The Indictment then alleges in paragraph 17 that there were customer complaints related to counterfeit items and of non-delivery. In response, the defendant allegedly "assured AF (Ashley Foster) that since the defendant purchased the items directly from the manufacturers themselves, they could not possibly be counterfeits, and also that all shipments to the customers had been made." See Indictment, para. 17, page 7. As a preliminary matter, any reference to counterfeit merchandise or related complaints should be deleted or removed from the Indictment. Plainly, this is a case regarding allegations of fraud where the purported injury and alleged wrongdoing is solely non-delivery of ordered merchandise. Therefore, any reference to such activity is not properly part of the alleged fraud scheme, and should be removed.

The second notable aspect of paragraph 17 is that the recipient of the allegedly false representations is Ashley Foster, and not any purchaser of merchandise. Without alleging that a material misrepresentation was made to an individual customer, the Government has not alleged, and may not maintain, a fraud theory whereby a customer was the victim in a fraud scheme.

Paragraph 18 alleges that defendant sent tracking numbers for orders to Ashley Foster, and further that the defendant "encouraged AF to submit these numbers to customers to address their complaints."   However, as is further alleged in paragraph 18, "AF discovered that many of the tracking number the defendant had provided her were not working or involved unrelated deliveries."   There are several deficiencies with this allegation.   First, the term "many" is unclear and ambiguous.   Second, the count does not specify whether the allegation regarding faulty tracking numbers is related to the $10,000 order from December 22, 2004 charged in the count or to some other order.

If the Government is contending that the allegedly false tracking information is in relation to orders other than the $10,000 order of December 22, 2004, then the scope and breath of Count One becomes entirely unclear.   On the other hand, if the Indictment is alleging that Ms. Levy intentionally[1] sent false tracking date to Ms. Foster specifically in relation to the December 22, 2004 order, then any reference to any other errant tracking number information is irrelevant and should excised from the Indictment as surplusage.

Paragraph 20 highlights the problems with Count One.   It alleges that at least five WWW.RUNWAYRENEGADE.COM customers were given neither refunds nor merchandise, resulting in a combined loss of $32,652.37, leading to the conclusion that victims of the fraud scheme would be these five customers.   However, the paragraph concludes that "as part of the

---

1The Indictment does not allege that Ms. Levy intentionally provided false tracking data to Ms. Foster. Instead, the Indictment merely states that "AF discovered that many of the tracking numbers the defendant had provided her were not working or involved unrelated deliveries."   Nonetheless, defense counsel has inserted the element of intent in regard to this activity insofar as the Government alleges this activity is "part of the scheme and artifice to defraud."   Certainly, the Government is not taking the position that an innocent mistake, assuming there was a mistake, on the part of defendant regarding the tracking information for an order is a "part of the scheme and artifice to defraud."   Such a position would be inconsistent with the requirement that a scheme to defraud be committed with fraudulent intent.   See United States v. Loayza, 107 F.3d 257 (4th Cir. 1997).   Therefore, the only allegation that would be sufficient is that Ms. Levy's conduct in this regard with intentional in nature.

scheme to defraud, the defendant made false representations to AF (Ashley Foster) that all customer complaints regarding WWW.RUNWAYRENEGADE.COM had been fully satisfied." Therefore, the victims of the fraud are not the customers themselves, but defendant's allegedly aggrieved business partner, Ashley Foster. Yet, this is far from clear. Nonetheless, what seems clear is that in connection with her web-business WWW.RUNWAYRENEGADE.COM, the purported victim, Ashley Foster, is alleged to have suffered no pecuniary injury whatsoever from fraud.

Paragraphs 21 through 25 discuss a second alleged aspect of the general scheme to defraud in Count One, that being in relation to a second web-business[3] opened allegedly by Ms. Levy and Ms. Foster together under the name WWW.BUBBLEPOPSHOP.COM. However, these allegations are every bit as vague, confusing, self-contradictory and deficient as the ones related to "Runway Renegade." For instance, paragraph 22 states that "AF (Ashley Foster) arranged for the website to accept credit card purchases," and that the proceeds from such sales were deposited into a joint bank account. Paragraph 22 closes by alleging that "as part of the scheme and artifice to defraud, the defendant paid herself approximately $4,045 with the checks from the Bank of America account." Again, it is unclear how this alleged payment could possibly relate to the charged fraud scheme.[4]

---

3The Government, apparently concerned by the implausibility of Ms. Foster's story that she was unaware of the fraud allegedly being perpetrated on her website by her business partner, Ms. Levy, offers in paragraph 21 an explanation of why exactly Ms. Foster would open a second business with the defendant after being so victimized in the first. The explanation in the indictment is as follows: "not knowing that the defendant has misled her about the status of the remaining WWW.RUNWAYRENEGADE.COM customers, AF agreed with the defendant to open a new web-based retain fashion clothing business called WWW.BUBBLEPOPSHOP.COM.

4A review of Count One of this extensive fraud indictment leads a reasonable reader to wonder why an allegation of one business partner paying herself a little over $4,000, over the apparent objection of the other, and then a second allegation that a business had to pay a charge back on a credit card of $5,500 is taking up docket space in federal court. It is respectfully submitted that a business dispute of barely over $9,500 between two partners is not an appropriate matter to be taken up by the Federal Government, which, as the old adage goes, "made a federal case out of it."

Paragraph 23 alleges that after receiving 30 to 40 online orders, every customer of "Bubblepopshop" demanded a chargeback (refund) from their credit card company on the orders which were allegedly not delivered. Apparently, when Ashley Foster set up the credit card account of Bubblepopshop, she, or perhaps her boyfriend, linked it to her boyfriend's merchant account because, as alleged in paragraph 23, "when all the funds had been depleted from the Bank of America account, the credit card processing company drew the remainder from AF's boyfriend's merchant account associated with an unrelated business, which was linked by the credit card processor to the (Bubblepopshop) account." Again, there is no allegation of any fraudulent misrepresentations on the part of Ms. Levy or anyone else that led to the non-delivery of the merchandise or the indebtedness leading to the chargebacks.

Instead, paragraph 25 alleges only that "it was part of the scheme and artifice to defraud that the defendant never fulfilled the orders of the (Bubblepopshop) customers, never paid back any of the approximately $4,045 that the defendant had taken out of the joint banking account, nor did the defendant pay back any of the approximately $5,500 in additional (Bubblepopshop) losses." Paragraph 25 combines two different types of alleged wrongs, each committed against different categories of potential victims. In regard to the Bubblepopshop customers, it is alleged that the defendant never fulfilled the orders. However, the Indictment does not allege that the failure to fill the orders stems from fraud. In particular, there is no allegation of a misrepresentation by defendant that caused a customer to part with any money.

In regard to Ashley Foster, there is likewise no allegation that the $4,045 Ms. Levy allegedly removed from the joint bank account was an act related to a fraudulent scheme in any way. Additionally, the $5,500 in chargebacks that was paid from Ashley Foster's boyfriend's

account is not connected in the indictment to any allegation of fraud on the defendant's part. Instead, the Government is operating on the premise that is can recite a laundry list of activities and link them together in a federal indictment so long as they claim each such activity is part of a scheme or artifice to defraud.

Count Two, charging Mail Fraud, incorporates the scheme from Count One and alleges that on December 27, 2004, the defendant caused to be mailed an envelope containing the $8,000 BB&T "official check" from Ashley Foster to Dina Lev.

Count Three, charging Interstate Transportation of Securities Taken By Fraud, likewise incorporates the scheme from Count One and alleges that the $8,000 BB&T "official check" is a security worth in excess of $5,000 and that such was taken by fraud. As addressed below, this count must be dismissed insofar as the charge of Interstate Transportation of Securities Taken by Fraud is legally insufficient given the allegations.

2.    Counts Four, Five and Six

Count Four purports to set forth a second scheme to defraud that is separate and distinct from the scheme in Count One. The time period for Count Four - January 2005 until late 2006 - overlaps with Count One – November 2004 until late 2005 - for the entire year of 2005. In other words, during 2005 both schemes to defraud were proceeding simultaneously. Also, the description of the scheme in Count One is identical to the scheme charged in Count Four. In particular, the alleged scheme and artifice to defraud in Count Four is set forth as follows:

"From on or about January 2005 and continuing through on or about late 2006, in the Eastern District of Virginia, and elsewhere, the defendant, INGRID DINA LEVY, devised and intended to devise a scheme and artifice to defraud individuals by either

10

failing to deliver all fashion clothing items they ordered or failing to deliver any items at all and to obtain from these individuals money and property by means of materially false and fraudulent pretenses and representations"

See Indictment, para. 5, page 12.  With the exception of the dates, the wording of this paragraph is absolutely identical to the description of the scheme in Count One.  Also, during 2005 these schemes proceeded at the same time.  Yet, they are charged in two separate counts.  The problem is that the scheme to defraud in Count One is so poorly defined that it is impossible to identify the contours of that scheme or to distinguish between the two schemes.  As a result, the two schemes are multiplicitous.

The scheme to defraud in Count Four alleges that the defendant registered the contact information for her website WWW.SHOPCHIC.NET as an address in Santa Monica, California, and that the defendant allegedly had any mail sent to the Santa Monica address forwarded to her residence in New York City.  However, there is no allegation in the Indictment that because the defendant used an address at a commercial mail box company as the address for her web business was intended to defraud anyone or that it did so.  As with Count One, there is no allegation in Count Four of a material misrepresentation to a purported victim.

Count Four further alleges that on December 28, 2005, an undercover agent ordered track suits from WWW.SHOPCHIC.NET, and that pursuant to defendant's instructions, the agent mailed a bank check from the Eastern District of Virginia in the amount of $1,020.00 to the Santa Monica address and that no clothing was received.

Count Four alleges one other specific example of an order that was not fully delivered. On October 31, 2005, a customer identified as SA of Texas ordered 130 pairs of designer jeans

and mailed an American State Bank "Official Check" in the amount of $7,980 payable to "Levy." The check was allegedly deposited into Ms. Levy's bank account. However, SA allegedly received only 16 pairs of jeans.

The final factual allegation of Count Four is that "it was part of the scheme and artifice to defraud that the defendant never satisfied the orders of dozens of customers throughout the United States and around the world and they were not given refunds. These unsatisfied orders total more than $100,000." This sweeping allegation that does not mention particular customers, dates, amounts or the particular facts that allegedly constitute or comprise the fraudulent scheme is included only to artificially enlarge the count beyond the two events actually cited in the count. Therefore, paragraph 11 of Count Four is surplusage that must be stricken.

Count Five charges Mail Fraud based on a federal agent mailing a $1,020 check to the Santa Monica mailing address on January 9, 2006. Count Six, charging Interstate Transportation of Securities Taken By Fraud, is legally insufficient for the same reasons set forth in regard to Count Three, charging the same offense.

ARGUMENT

POINT ONE
COUNTS ONE, TWO AND THREE SHOULD BE DISMISSED AS BEING
UNCONSTITUTIONALLY VAGUE, DUPLICITOUS AND MULTIPLICITOUS

The fraud scheme charged as part of count one, and included by reference in counts two and three, suffers from three legal deficiencies that serve to prejudice Ms. Levy in her preparation to fight these charges. First, the fraud scheme is unconstitutionally vague in that the number and identity of the customers allegedly defrauded, as well as the nature of the fraud upon

them are impossible to discern.[5]  Second, the fraud scheme is duplicitous because it alleges two

entirely different offenses – that Ms. Levy defrauded her business partner, Ashley Foster, and

that she defrauded customers ordering clothing.  That these are in fact different offenses and not

part of the same scheme, or at least believed by the Government to be separate offenses, is

evidenced by the fact that the alleged fraud of the customers is also set forth in Count Four,

which will be further addressed below.  Third, the fraud scheme in Count One is multiplicitous

because it is indistinguishable from that in Count Four.  As a result, these two virtually identical

fraud schemes occurring over the same time period are in fact, if anything, a single scheme

errantly charged in two separate counts.  For all of these reasons, the fraud scheme set out in

Count One, and incorporated by reference to Counts Two and Three, is legally and

constitutionally deficient.  Therefore, Counts One, Two and Three should be dismissed.

The Sixth Amendment to the U.S. Constitution guarantees that "'in all criminal

prosecutions, the accused shall enjoy the right…to be informed of the nature and cause of the

accusation…"  Russell v. United States, 369 U.S. 749, 761, 82 S.Ct 1038 (1962) *quoting* U.S.

Constitution, amend. VI.  The Sixth Amendment right is augmented by Rule 7(c ) of the Federal

Rules of Criminal Procedure, which sets forth the minimum pleading standards applying to

indictments.  In particular, Rule 7(c) provides that an indictment must contain a "plain, concise

and definite written statement of the essential facts constituting the offense charged."  Equally

important is Federal Rule of Criminal Procedure 8(a), which requires that there be a separate

count for each charged offense.

---

5 For instance, Count One of the Indictment charges as follows: "there were at least five
WWW.RUNWAYRENEGADE.COM customers who were never given refunds," See Indictment, para.
20, page 7 "(emphasis added); and "after the WWW.BUBBLEPOPSHOP.COM website received
approximately 30 to 40 online orders in the initial two months, every single customer of
WWW.BUBBLEPOPSHOP.COM demanded a refund.  See Indictment, para.23, page 8 (emphasis
added).  Who these individuals are, how they were defrauded and how Ms. Levy should prepare for a trial
with such an allegation is altogether unclear.

In passing on the sufficiency of an indictment, several factors must be reviewed. <u>See</u> <u>generally</u> <u>Hamling v. United States</u>, 418 U.S. 87, 117, 94 S.Ct. 2887 (1974). First, the indictment must contain the elements of the offense charged and fairly inform the defendant of the charge he must defend. <u>See</u> <u>United States v. Pupo</u>, 841 F.2d 1235 (4th Cir. 1988)(Indictment that cites the statute charged but does not specifically include in its charging language each element of an offense is defective); <u>see</u> <u>also</u> <u>Finn v. United States</u>, 256 F.2d 304, 306 (4th Cir. 1958). Second, it must enable to the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense. <u>United States v. Loayza</u>, 107 F.3d 257 (4th Cir. 1997); <u>United States v. Alfonso</u>, 143 F.3d 772, 776 (2d Cir. 1998). The cases teach that "common sense and reason prevail over technicalities," <u>United States v. Sabbeth</u>, 262 F.3d 207, 218 (2d Cir. 2001) and that the indictment must be read in its entirety and "should be read to include facts which are necessarily implied by the specific allegations." <u>United States v. Stravroulakis</u>, 952 F.2d 686, 693 (2d Cir. 1992); <u>see</u> <u>also</u> <u>United States v. Hernandez</u>, 980 F.2d 868, 871 (2d Cir. 1992).

Ordinarily, an indictment is upheld when it tracks the statutory language and sets forth the approximate time and place of the crime. <u>Alfonso</u>, 143 F.2d at 776. However, where counts of an indictment are vague, duplicitous and multiplicitous, and where the defendant is prejudiced thereby and lacks sufficient notice, such counts should be dismissed. Although the legal principles of constitutional vagueness, duplicity and multiplicity are related, and should be considered in combination, each will be addressed independently.

1. <u>Counts One, Two and Three are Unconstitutionally Vague</u>

"An indictment not framed to apprise the defendant 'with reasonable certainty, of the nature of the accusation against him is ...defective, although it may follow the language of the statute." Russell, 369 U.S. at 765, 82 S.Ct. at 1047, *quoting* United States v. Simmons, 96 U.S. 360, 362 (1877). "'Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged. Russell, 369 U.S. at 765, 82 S.Ct. at 1048, *quoting* United States v. Hess, 124 U.S. 483 (1888).

Courts have therefore required that an indictment set forth greater particularity than the mere charging language "where the definition of an offense, whether it be at common law or by statute, included generic terms," and the indictment therefore "must state the species of the offense." United States v. Cruikshank, 92 U.S. 542, 544 (1875). The term "scheme to defraud" is precisely the type of broad and general term envisioned by the decision in Cruikshank insofar as the term is not defined in either the mail or wire fraud statutes under Title 18, U.S.C., Sections 1341 and 1343. Moreover, the legislative history, being particularly sparse, sheds no additional light on what Congress intended when it used this term and placed it squarely in the center of these two widely-used statutes. See generally Mark Zingale, Note, Fashioning a Victim Standard in Mail and Wire Fraud: Ordinary Prudent Person or Monumentally Credulous Gull, 99 Colum. Law Rev. 795 (1999).[6] As a general matter, a scheme to defraud involves depriving a person of

---

6 Legal commentators have written extensively on the increasingly open-ended definition of scheme to defraud. See Podgor, Elleen S., Criminal Fraud, 48 Am. U. L. Rev. 729, 733 (1999)(the scheme or artifice to defraud element of generic fraud statutes, such as mail fraud, has expanded and contracted throughout the years; Szott-Moohr, Geraldine, Mail Fraud and the Intangible Rights Doctrine: Someone to Watch Over Us, 31 Harv. J. on Legis. 153, 160-61 (1994)(courts have given a broad definition to the term scheme to defraud); Williams, Gregory Howard, Good Government by Prosecutorial Decree: The Use and Abuse of Mail Fraud, 32 Ariz. L. Rev. 137, 151 (1990)(courts follow a "floating definition" of the term scheme to defraud.).

something of value by means of a trick, deceit, or chicanery.  See generally McNally v. United States, 483 U.S. 350, 358 (1987).   However, this generic definition is very broad and does not adequately apprise defendant of the nature of the charge, consistent with Cruikshank.

An example of the principle enunciated in Cruikshank was the fact pattern presented by Russell, 369 U.S. at 749.  In Russell, the defendant was charged with refusing to answer questions posed by a Senate subcommittee.  The Supreme Court held that the indictment was constitutionally deficient because it failed to identify the subject matter of the congressional inquiry and "(a)t every stage of the ensuing criminal proceedings (defendant) was met with a different theory."  As a result, the Court found that the indictment failed to inform the defendant of the charges against him and "left the prosecution free to roam at large."

Similarly, in the instant case, the fraud scheme set forth in Count One is vague in two general respects.  First, there is no allegation that permits the defendant to know which customers or which alleged misrepresentations are the subject of the alleged fraud scheme.  For instance, the Indictment contains the following allegations: (1) "there were at least five WWW.RUNWAYRENEGADE.COM customers who were never given refunds," see Indictment, para. 20, page 7 "(emphasis added); and (2) "after the WWW.BUBBLEPOPSHOP.COM website received approximately 30 to 40 online orders in the initial two months, every single customer of WWW.BUBBLEPOPSHOP.COM demanded a refund.  see Indictment, para.23, page 8 (emphasis added).  These allegations, as did the ones struck down in Russell are vague because they permit the prosecution to "roam at large" through the universe of potential customers without providing notice to Ms. Levy of what the count is actually charging her with.

The second reason that the fraud scheme in Count One is vague is because it lacks an allegation that Ms. Levy or Ms. Foster, as defendant's business partner, made a misrepresentation that reasonably could substantiate a fraud charge involving the customers.[7] As a result, defendant is simply not on notice of how, if at all, she defrauded these customers referred to in Count One. The Fourth Circuit has held that where an "indictment…fails to state the entire nature of the accusation" against the defendant, such must be dismissed. United States v. Hayes, 775 F.2d 1279, 1282 (4th Cir. 1985). Like the pleading deficiency in this case, the Fourth Circuit in Hayes held, "it is apparent from a reading of Count 1 that no mention is made of any subsequent overt act in furtherance of the unlawful activity." Id. at 1282. "In view of the requirements of Russell, that an indictment set forth the essential elements of the crime being charged, we are required to find Count 1 insufficient on its face." Id. The Court concluded, "such failure 'fails to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.'" Hayes, 775 F.2d at 1282,3 quoting Russell, 369 U.S. at 768.

Also instructive is the Second Circuit's decision in United States v. Pirro, 212 F.3d 86 (2d Cir. 2000), where the Circuit upheld the dismissal of an indictment charging the defendant with making false material statements on his federal income tax return. The Circuit found that the indictment was flawed because it failed to plead the crucial background facts creating defendant's duty to disclose the facts that were omitted from the tax return, and that without these details, the defendant "was not adequately informed of the nature of the accusations against him…(and) the grand jury may not have understood the elements of the crime and the evidence

---

7 The Second Circuit case of United States v. Starr, 816 F.2d 94 (2d Cir. 1987) stands for the general proposition that "misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself." Id. at 98.

necessary to support the indictment." Likewise, in this case, by failing to state any particular misrepresentation on which an alleged fraud victim relied, this fraud scheme, and Counts One, Two and Three relying upon it, are unconstitutionally vague and legally insufficient.

Another instructive decision is United States v. Bobo, 344 F.3d 1076 (11th Cir. 2003), where the Eleventh Circuit vacated a conviction on the grounds that the indictment charging a doctor with executing a fraud scheme regarding a health care program was insufficiently specific. The Court noted, "the indictment does not specify the scheme or artifice to defraud with which the government was charging Dr. Bobo. The indictment contains no indication of what the government contended was unlawful about Dr. Bobo's conduct." Bobo, 344 F.3d at 1084. The Court goes on to state that although the indictment uses the terminology "bribe," and "bid rigging" scheme, "no evidence exists to support such an allegation." Id. at 1084. Instead, as set forth in the Indictment, the alleged bribe was made to another doctor, and not to a competing bidder. Id. The indictment struck down in Bobo is remarkably similar to the one here. Therefore, based on Bobo, Pirro, and the Supreme Court decisions in Russell and Cruikshank, and the other cases cited herein, Counts One, Two and Three are unconstitutionally vague.

2. The Fraud Scheme Is Duplicitous

The alleged fraud on Ashley Foster and the alleged fraud on the customers purchasing clothing are completely different from each other in terms of victims, the nature of the alleged misrepresentations and accordingly cannot co-exist as part of the same scheme or in the same counts.[8] Insofar as the crime of mail fraud requires injury or intended injury to an actual victim,

---

8 It is worth mentioning that Ashley Foster never lodged a complaint of any sort that she was the victim of some type of misconduct by her business partner. Although the defendant has not yet received any discovery on this issue, it appears that she first mentioned the $5,500 in chargebacks only when the FBI visited her some number of years ago to inquire about the possibility that she was selling counterfeit

see United States v. Gabriel, 125 F.3d 89 (2d Cir. 1997); United States v. Dixon, 536 F.2d 1388 (2d Cir. 1976); United States v. Regent, 421 F.2d 1174 (2d Cir. 1970), the allegation must specify a victim of the allegedly fraudulent conduct.  Because the nature of a fraud on defendant's business partner, Ms. Foster, is completely different from a fraud on customers, Count One charges two separate schemes to defraud in a single count.

An indictment is impermissible duplicitous when it combines two ore more distinct crimes into one count in violation of Federal Rule of Criminal Procedure 8(a)'s requirement that there be a "separate count for each offense," and where the defendant has been prejudiced by the error.  See United States v. Margiotta, 646 F.2d 729 (2d Cir. 1981).  Here, defendant has been prejudiced by the duplicity in two ways.  First, since the loss allegedly suffered by Ashley Foster is relatively minor, totaling $5,500 in credit card charge-backs, while the non-delivery of items to the customers is over $100,000, by conflating the two schemes in one count, the Government has unfairly charged Ms. Levy with a fraud involving over $100,000 where in fact Ms. Foster has lost, at most, $5,500.  Second, Ms. Levy is compelled to defendant herself against two disparate allegations joined together in a single fraud scheme and in a single count.

    3.    Counts One And Four Are Multiplicitous In That They Charge The Same Offense.

The Fourth Circuit has recognized that the doctrine of multiplicity involves "charging a single offense in more than one count in an indictment."  United States v. Colton, 231 F.3d 890, 908 (4th Cir. 2000) quoting United States v. Mancuso, 42 F.3d 836 (4th Cir. 1994); see also United States v. Stewart, 256 F.3d 231 (4th Cir. 2001)(money laundering indictment charging promotion and concealment in separate counts found to be multiplicitous).  "The multiplicity

---

items.  The counterfeit merchandise aspect of the investigation has not resulted in either Ashley Foster or Ms. Levy being charged with any crime, nor does it appear ongoing.

doctrine finds its roots in the Fifth Amendment's Due Process clause which 'assures that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Colton, 231 F.3d at 908, *quoting* Brown v. Ohio, 432 U.S. 161, 165, 97 S.Ct. 2221 (1977); see also United States v. Dunford, 148 F.3d 385 (4th Cir. 1998)(multiplicitous indictment including separate weapon possession counts for each firearm found on defendant impermissible resulted in 14 sentences for single act).

The two schemes to defraud set forth in the Indictment, alleged in Count One and Count Four, are indistinguishable in terms of the class of victims, the general contours of the alleged fraud and the general time period over which they allegedly took place. As a result, it seems reasonable to assume that the Government's evidence, taken in the light most favorable to the Government, is that the acts of fraud upon the individual customers were planned and contemplated together as part of a common plan. In Colton, 231 F.3d at 909-10, the court, in concluding that an indictment charging separate counts of bank fraud in furtherance of a single overall scheme was multiplicitous, observed that "evidence that acts are 'planned or contemplated together' may indicate that they are dependent on each other and cannot be separately charged." Id., *quoting* United States v. Allender, 62 F.3d 909, 912 (7th Cir. 1995). The decision in Colton also cites a Fifth Circuit case, United States v. Heath, 970 F.2d 1397, 1402 (5th Cir. 1992), where "although a scheme to defraud involved two loans, it was held only to have resulted in a single execution because the two loans 'were integrally related; one could not have succeeded without the other;" hence the indictment charging procurement of each loan as a separate execution was found to be multiplicitous." Colton, 231 F.3d at 909, *quoting* Heath,

20

970 F.2d at 1402. Similarly, in this case, the fraud schemes set forth in Counts One and Four are in fact, if anything, a single scheme. Accordingly, Count One should be dismissed.

POINT TWO
COUNTS FOUR, FIVE AND SIX SHOULD BE DISMISSED AS BEING
UNCONSTITUTIONALLY VAGUE AND MULTIPLICITOUS

The scheme charged in Count Fours, Five and Six is vague and multiplicitous.

First, it is vague because there is no allegation that Ms. Levy made any false statement or representation as part of the alleged scheme.[9] Lacking this allegation, the fraud scheme in Count Four fails for the same reason as did the Indictment in Russell v. United States, 369 U.S. 749, 761, 82 S.Ct 1038 (1962), and for the reasons set forth in POINT ONE above.

Second, also for the reasons set forth in POINT ONE, the fraud scheme in Count Four is multiplicitous because it is indistinguishable from that in Count One.

POINT THREE
COUNTS THREE AND SIX ARE LEGALLY INSUFFICIENT AND MUST BE
DISMISSED AS A MATTER OF LAW

Counts Three and Six charge the offense of Interstate Transportation of Securities Taken By Fraud. Count Three charges that the $8,000 BB&T "Official check" mailed by Ashley Foster to the defendant is a security that was taken by fraud. Count Six charges that the $7,980 American State Bank "Official check" mailed by a customer, SA, to the defendant is a security that was taken by fraud. However, there is no factual allegation that the $8,000 BB&T check of the $7,980 American State Bank check were taken by fraud, as required by Section 2314.

Succinctly put, the Indictment alleges that as a result of two fraud schemes, Ms. Levy received payment from her business partner and from a customer, and that these payments came

---

9 The Indictment does allege that Ms. Levy used a mailing address in Santa Monica, California. However, it is hard to imagine that the Government is charging the use of a mailing address, which is something done regularly by businesses in America, as the sole basis of the fraud scheme.

to her via check.  However, even assuming this allegation to be true, it is not alleged that the two bank checks were themselves taken through fraudulent means.  As a result, the Interstate Transportation of Stolen Property charges are legally deficient and should be dismissed.

A review of the cases in this area indicate that those decisions upholding a conviction under Section 2314 address facts where a check or other security was itself taken through fraud or was implicit in the fraud scheme.  For example, in United States v. Pomponio, 558 F.2d 1172 (4th Cir. 1977), the defendant pledged all the stock of a certain corporation to a particular person.  However, nine months later, defendant, having bought a second stock book, fraudulently pledged the exact same stock to a second person, and then sent the second stock book interstate to the subsequent pledgee.  Insofar as the defendant sent the second stock book interstate with fraudulent intent, his conviction for violating Section 2314 was affirmed by the Fourth Circuit. Id. at 1174.  Since the sending of the second stock book was itself the fraud, the court upheld the conviction.  Similarly, in United States v. Lennon, 814 F.2d 185 (5th Cir. 1987), defendant arranged a "kickback" scheme where the defendant fraudulently wrote inflated checks to a crude oil supplier, who would then pay a portion of that money to one of the defendant's other companies.   The Fifth Circuit upheld defendant's conviction under Section 2314 because "the fraud occurred at the time the checks were sent from Charter (defendant) to Petrochem (the supplier) because that is when Lennon inflated the amount of each Charter check in order to finance the ultimate kickback from Jones (the supplier) to Lennon's companies."  Lennon, 814 F.2d at 187.  Thus, in each of these cases, the checks themselves constituted the fraud and perpetuated the fraudulent conduct.

On the other hand, the checks from Ms. Foster (Count One) and the apparel customer (Count Four) represent nothing more than payment to Ms. Levy.  The Government's theory seems to be that any time a check is sent interstate relating to fraudulent activity, that each such check can be charged as a violation of Section 2314.  This is truly an absurd result, and not one Congress could have intended, nor that the Supreme Court appears to endorse in its decision in Dowling v. United States, 473 U.S. 207, 105 S.Ct. 3127 (1985).

As set forth in Dowling, Congress intended Section 2314 to address activity where property that was itself stolen was moved interstate.  Specifically, "Congress enacted Sec. 2314 as an extension of the National Motor Vehicle Theft Act…Passed in 1919, the earlier Act was an attempt to supplement the efforts of the States to combat automobile thefts."  Id, 473 U.S. at 218, 105 S.Ct. 3134.  In 1934, Congress passed the National Stolen Property Act that expanded the law that had applied to stolen vehicles to other forms of property.  The Supreme Court explained that "Congress acted under its commerce power to assist States' efforts to foil the 'roving criminal,' whose movement across state lines stymied local law enforcement officials."  Id., 473 U.S. at 220, 105 S.Ct. at 3134.  In light of this history, the Supreme Court declined to extend Section 2314 to phonorecords that were sent in interstate commerce and which contained unauthorized recordings of commercial performances, in violation of the copyright act.  The Court reasoned, "by virtue of the explicit constitutional grant, Congress has the unquestioned authority to penalize directly the distribution of goods that infringe copyright…Given that power, it is implausible to suppose that Congress intended to combat the problem of copyright infringement by the circuitous route hypothesized by the Government."  Id., 473 U.S. at 221, 105 S.Ct. at 3135.

Likewise, in the instant case, it is implausible that Congress intends to permit the Government to prosecute each check that flows from fraudulent conduct as an independent violation of Section 2314. This is especially true when the scope of mail and wire fraud certainly provide the Government with ample prosecutorial charging options without resorting to the theory underlying Counts Three and Six.

For these reasons, Counts Three and Six should respectfully be dismissed.

POINT FOUR
THE GOVERNMENT SHOULD BE
DIRECTED TO FILE A BILL OF PARTICULARS

Due to the vague and contradictory nature of the allegations contained in Counts One and Four, the defendant has not been adequately apprised of the specific factual allegations nor of the evidence against her. Thus, it is particularly imperative that the Government provide a Bill of Particulars setting forth the precise contours of the two schemes.

Rule 7(f) of the Federal Rules of Criminal Procedure "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). As noted by the Fourth Circuit, a Bill of Particulars is "to fairly apprise the defendant of the charges against him so that he may adequately prepare a defense and avoid surprise at trial. United States v. Automated Med. Labs., Inc., 770 F.2d 399, 405 (4th Cir. 1985). The test in ruling on a request is whether by depriving the defendant of the requested information, the Court will render her subject to unfair surprise at trial. United States v. Fletcher, 74 F.3d 49 (4th Cir. 1996). Since the trial court is in the best

position to determine the need for further particulars, its decision on whether to grant the request is a matter within its sound discretion.  United States v. Jackson, 757 F.2d 1486 (4th Cir. 1985).

In this case, the Government should specify, among other things, (1) the allegedly false representations made by defendant comprising the scheme to defraud in Counts One and Four, (2) to whom these allegedly false representations were made, (3) when these allegedly false representations were made, (4) the identities of the persons allegedly defrauded under the two schemes set forth in Counts One and Four, (5) the precise time that the schemes in Counts One and Four commenced and were terminated,[10] (6) whether for any length or period of time, Ashley Foster was a co-conspirator of Ms. Levy.

POINT FIVE
SURPLUSAGE IN COUNTS ONE AND FOUR SHOULD BE STRICKEN

Federal Rule of Criminal Procedure 7(d) provides that "the court on motion of the defendant may strike surplusage from the indictment or information."  Surplusage is generally defined as "extraneous, impertinent, superfluous, or unnecessary matter."  Black's Law Dictionary, 5th Edition, West Publishing Company 1979, p. 1294.  In the context of a pleading, it is further defined as "allegations of matter wholly foreign and impertinent to the cause.  All matters beyond the circumstances necessary to constitute the action.  Any allegation without which the pleading would yet be adequate."  Id.

The indictment contains two different forms of surplusage.  First, it contains allegations that are open-ended and suggest that defendant committed criminal activity beyond that which is specifically charged.   Second, depending on how the scheme in Counts One and Four are defined, the indictment may contain criminal allegations that are not actually charged.

---

10 This is critical information in determining whether those two alleged schemes are in fact one scheme.

Regarding the first type, the Indictment charges, for instance, that defendant devised a scheme to defraud individuals "by either failing to deliver all fashion clothing items they ordered or failing to deliver any items at all and to obtain from these individuals money and property by means of materially false and fraudulent pretenses and representations."  See Indictment, para. 8, page 4.  It also charges in paragraph 18, "AF discovered that many of the tracking number the defendant had provided her were not working or involved unrelated deliveries."  Moreover, paragraph 19, alleging that Ms. Levy was given access to Ms. Foster's e-mail account appears to be pointless and pure surplusage.   Paragraph 20 alleges that at least five

WWW.RUNWAYRENEGADE.COM customers were not given refunds and did not receive their ordered merchandise, totaling $32,652.37.   Paragraph 23 alleges that after receiving 30 to 40 online orders, every customer of "Bubblepopshop" demanded a chargeback (refund) from their credit card company on the orders which were allegedly not delivered.  These sorts of non-specific allegations that suggest criminal activity broader than the specific charges are routinely stricken as being surplusage.  See United States v. Freeman, 619 F.2d 1112 (5th Cir. 1980)(reference in the indictment to particular events that "included but were not limited to, the following" should have been treated as surplusage); United States v. Poindexter, 725F. Supp. 13 (D.C.D.C. 1989)(Terms such as "among other things," "among others," "at least," "including," "included but not limited to," "in part," and "various" could indicate to the jury that defendant was charged with offenses and conduct in addition to those actually listed in the indictment and should be stricken as surplusage.)

Second, in regard to the relevance of certain allegations, this determination of which matter in the Indictment is surplusage and which is truly material to the allegations is dependent

on the nature, scope and content of the allegations, an issue which itself remains unclear. <u>See</u> POINTS ONE and TWO above. For instance, if the allegation in Count One is that Ashley Foster is the sole victim of the fraud alleged in that count, then any allegation regarding any of the customers would be surplusage and should be stricken. On the other hand, if the Government takes the position that Ms. Foster as well as certain customers were defrauded as part of the fraud scheme in Count One, then the scope of material allegations in that count would expand to include all such conduct. <u>See generally</u> <u>United States v. Behenna</u>, 552 F.2d 573 (4th Cir. 1977)(material in an indictment that is descriptive of what is legally essential to the charge cannot be stricken as surplusage). Accordingly, the issue of surplusage cannot be fully addressed until the scope of the allegations in Counts One and Four are made clear.

<u>POINT SIX</u><br>
<u>THE GOVERNMENT SHOULD BE PRECLUDED FROM ADMITTING</u><br>
<u>INTO EVIDENCE OR OTHERWISE UTILIZING ANY PHYSICAL ITEMS</u><br>
<u>RECOVERED OR OBSERVED DURING THE EXECUTION</u><br>
<u>OF THE SEARCH WARRANT ON MS. LEVY'S HOME</u>

It is beyond dispute that a search warrant affidavit is properly disclosed to defendant's counsel in a case where the Government indicates that it intends to utilize materials recovered during the search of defendant's home, pursuant to the warrant, on its direct case. However, despite the fact that the search of defendant's home took place over a year ago, and despite the fact that defendant was arraigned in July of 2007 in the instant matter, the search warrant affidavit has not yet been provided to defendant's counsel, despite persistent requests that such be provided. Instead, according to the Government, the affidavit remains sealed in a court file within the Eastern District of New York, where the warrant was signed by a judge over a year ago. The trial in this matter has already been adjourned twice due, in large measure, to

the fact that the search warrant affidavit has not been provided in discovery. Therefore, given that the trial in this matter will commence on January 15, 2008 and that the warrant affidavit still has not been provided, counsel is constrained to request that the Court preclude the Government from utilizing any evidence or information that it acquired during the execution of the search warrant on defendant's home.

POINT SEVEN
THE GOVERNMENT SHOULD BE PRECLUDED FROM ADMITTING
INTO EVIDENCE OR REFERRING TO A STATEMENT ALLEGEDLY
MADE BY DEFENDANT TO FEDERAL AGENTS DURING
THE EXECUTION OF THE SEARCH WARRANT OF HER HOME

The Government has given counsel notice that it intends to offer in its direct case a statement allegedly made by Ms. Levy to Special Agents of the FBI during the execution of the search warrant on her home. For the same reasons that counsel is requesting that the Court preclude any evidence recovered during the warrant execution (see POINT SIX above), counsel further requests that this statement likewise be precluded.

POINT EIGHT
THE GOVERNMENT SHOULD BE DIRECTED TO
CONTINUE TO TURN OVER DISCOVERY

Counsel has been advised that the Government is in possession of additional items of discovery, including the contents of her computer which was seized by the FBI during the search of her home. Counsel requests that these and any other items of discovery be disclosed immediately so as not to jeopardize the January 15, 2008 trial date.

POINT NINE
HANDWRITTEN NOTES OF AGENTS SHOULD BE RETAINED

Counsel requests the Court to direct the Government to instruct the agents involved in the investigation of this case to retain their handwritten notes. While such is important in regard to all witness interviews, it is particularly important regarding the interview of the defendant,

during which the agents claim the defendant made certain statements. Defendant challenges the accuracy of the report of this statement. Therefore, counsel requests that the handwritten notes of the agents during the statement of the defendant be maintained and be disclosed to counsel in advance of trial, at a time deemed appropriate by the Court. Additionally, counsel requests that all handwritten notes of the agents be maintained and disclosed to counsel at the time other discoverable material is provided to counsel during the course of the trial.

POINT TEN
BRADY MATERIAL SHOULD BE DISCLOSED

Counsel respectfully reminds the Government of its Brady obligation. In particular, based on the charged schemes, it appears the Government will try to prove that defendant formed the specific intent to ship nonconforming goods, or none at all, at the time she made certain misrepresentations to different parties. Indeed, this must be the Government's theory in order to substantiate the counts of mail and wire fraud. Therefore, defendant contends that all evidence in the Government's possession that she in fact regularly shipped conforming goods to the overwhelmingly vast majority of her customers is Brady material in light of the Government's theory in this case. Accordingly, defendant requests that all such material be provided. In addition, defendant is making the specific request that any statements of Ashley Foster or any other witness that is inconsistent with defendant's guilt of the charged crimes be disclosed.

POINT ELEVEN
ABILITY TO REPLY OR MAKE ADDITIONAL MOTIONS

Defendant requests that she be permitted to file a timely reply to the Government's response to these motions. Additionally, depending on the progress of further discovery or motions by the Government, defendant requests the ability to make additional, appropriate motions in the future.

<u>CONCLUSION</u>

For these reasons, defendant respectfully requests the relief set forth above.


Respectfully Submitted,


Date:  December 28, 2007          By: <u>/s/</u>_____


Sarah E. Moffett (VSB No. 72208)
LeCLAIR RYAN, A Professional Corporation
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314
Telephone:     (703) 647-5930
Facsimile:     (703) 647-5980
Sarah.Moffett@leclairryan.com
***Counsel for Defendant Ingrid Dina Levy***

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of December, 2007, I will electronically file the

foregoing Memorandum of Law in Support of  Ingrid Dina Levy's Pretrial Motions with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing

(NEF) to the following:

Jay V. Prabhu
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3700
(703) 299-3981
Jay.Prabhu2@usdoj.gov
***Counsel for United States of America***


Steven D. Brown (VSB No. 42511)
LeCLAIR RYAN, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
P.O. Box 2499
Richmond, Virginia 23218-2499
Telephone: (804) 783-7516
Facsimile: (804) 783-7616
Email: Steven.Brown@leclairryan.com
***Counsel for Defendant Ingrid Dina Levy***


AND a true and correct copy was sent via First Class Mail to the following:

Marc Agnifilo, Esq.
Brafman & Associates
767 Third Avenue
New York, New York 10017
***Counsel for Defendant Ingrid Dina Levy***

/s/ _____
Sarah E. Moffett (VSB No. 72208)
LeCLAIR RYAN, A Professional Corporation
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314
Telephone:        (703) 647-5930
Facsimile: (703) 647-5980
Sarah.Moffett@leclairryan.com
***Counsel for Defendant Ingrid Dina Levy***