**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Hon. James C. Cacheris |
| | ) | |
| . | ) | Criminal No. 1:07 CR 265 |
| | ) | |
| INGRID DINA LEVY, | ) | Sentencing: May 29, 2008 |
| | ) | |
| Defendant. | ) | |

**POST-TRIAL MOTION AND**
**SENTENCING MEMORANDUM**

In this combined post-trial motion and sentencing memorandum, Ms. Levy makes several

requests.  By way of a post-trial motion, she moves to set aside the conviction on the grounds

that the Government was permitted to present evidence, over defendant's objection and in

violation of the Sixth Amendment to the U.S. Constitution, concerning losses suffered by

individuals who did not testify at the trial and e-mail correspondence from these individuals[1] in

which they claimed they were defrauded by Ms. Levy.

In the event the post trial motion set forth above is denied, Ms. Levy requests that the

Court employ a sentencing analysis consistent with the following three provisions: first, that she

be sentenced based solely upon, and restitution be limited to, the facts presented to the jury;

second, that pursuant to 18, U.S.C., Sec. 3553(a), she be sentenced to a term of probation; and

third, that while restitution is appropriate for those victims with provable losses, forfeiture is not.

---

[1] In particular, as will be set forth further below, the Government admitted as Government's
Exhibit 31 over 100 of pages of e-mails from the following ten customers who each claim in the
e-mails, in substance, that he or she paid for and did not receive any merchandise: (1) Akito
Toyota, (2) Stephanie Black-Belus, (3) Nicole Splinter, (4) Sara Holmquist, (5) Brenda
McCready, (6)  J.R. Lanes, (7) Claire Stancarone, (8) Amy Thane, (9) Michelle Cross, (10) Kym
Rainbird.  Of the ten, the only one to testify was Claire Stancarone.

Finally, in the event the Court sentences Ms. Levy to a term of incarceration, she should be permitted to remain at liberty pending an appeal.

BACKGROUND AND FACTUAL SUMMARY

1.    Ms. Levy's Background and Family

Ingrid Levy is a 30 year-old housewife, mother of three small children, who has never before been in trouble with the law.  Indeed, she has devoted her adult life to spending time with, raising, helping and working with, children.  She has done this first and foremost as a devoted mother, and secondarily as a professional piano instructor.   In regard to her parental responsibilities, she bears these largely by herself.  As reflected in the Pre-sentence Investigation Report, her father has passed away and her mother lives in France.  Her husband, Joe, is a wonderful and devoted father.  But, as with many fathers, he works long hours to provide for his family, leaving Ms. Levy to raise the children day to day.  Although she has three siblings, two of them reside in France and one lives in Florida.  So, it is up to Ms. Levy to provide a stable and enriching family life to her three children: Dylan (age 9), Savannah (age 6) and Dakota (age 2).

Ms. Levy was born in France, came lawfully to the United States, and married Joe when she was just 20 years old.  Less than two years later, they had their first child, Dylan, who celebrated his 9th birthday last week.  Dylan suffers from a well-recognized learning disability called Auditory Processing Disorder (APD).   When Dylan was 1½ years old, Ms. Levy noticed that he did not make eye contact, he had no speech, his motor skills were lacking and he had nervous tics.  She believed her son may have autism, and enrolled him in the New York State Early Intervention Program (E.I.).  For several years, despite intensive examination, no diagnosis of Dylan's condition could be given.  Through the E.I. program, however, Dylan received intensive one-on-one counseling and training from trained professionals in, among other fields,

2

speech, physical therapy and occupational therapy. The Levy's placed Dylan in a school that could tend to his needs. In addition he was aided by a SEIT (Special Education Itinerant Teacher) who "shadowed" him, helping him play and interact with other kids and easing his transitions throughout his school day.

As with many school-aged children suffering from APD, see generally American Speech-Language-Hearing Association (2005), (Central) Auditory Processing Disorders (Technical Report), available from www.asha.org/policy, Dylan also experiences difficulties such as learning disabilities, language-deficiencies, social difficulties, impaired motor functioning, and nervous tics. Part of his prescribed treatment regimen involves the necessity of a stable, consistent and familiar household environment.

In order to provide Dylan with the stability he needed, Ms. Levy stopped tutoring children in piano to spend more time with Dylan and better ensure a positive learning and growing environment for him. She enrolled him in the McCarton Center for Developmental Pediatrics[2], a leading program in the New York area for children with developmental disabilities and special needs. Since the Early Intervention program is restricted to children before their third birthday, Dylan currently sees a tutor/therapist who helps him with his physical, emotional and intellectual challenges.

Dylan, Savannah and Dakota rely completely on Ms. Levy and she literally spends every waking hour with them. With the exception of her time in Virginia during this trial, Ms. Levy never spends a night away from her children.

---

[2] The center was founded by Cecilia McCarton, MD, a leading expert in developmental pediatrics and a clinical professor in Pediatrics at the Albert Einstein College of Medicine.

2.    <u>Background of the Apparel Businesses</u>

At some time after the birth of Ms. Levy's second child, Savannah, Ms. Levy found she did not fit into much of her clothing. So, she decided to sell them over the internet to make extra money. She never intended to turn this into a large or highly profitable business, but was hoping merely to supplement the income of Mr. Levy. She started a wholesale on-line clothing business where she sold high-end jeans and other items. The business was a wholesale, as opposed to retail, business. This distinction is very important. With a wholesale business, the customer expects to pay less for the merchandise than in a retail store. In turn, the customer expects that not all merchandise is in stock and that there may be waiting periods for certain popular items. Also, the wholesale customer should reasonably expect to place orders on "lots" of clothing, rather than hand picking individual pieces.

Over time, Ms. Levy's business grew in popularity. The vast majority of customers were not individuals, but were other on-line clothing businesses looking to buy the clothing from Ms. Levy to turn around and sell it to their own customers.[3] Levy had a difficult time keeping up with the volume of orders, and many of the orders were delayed as Ms. Levy located and purchased the clothing. In many instances, Ms. Levy informed the customer that the order may be delayed. Because her prices were so low, and because she was one of the few independent apparel vendors selling authentic merchandise, customers continued to place orders despite the periodic delays in shipment.

Shortly after starting the business, Ms. Levy entered a business partnership with Ashley Foster. Prior to joining with Ms. Levy, Ms. Foster had been running her own web-based apparel business. She approached Ms. Levy, requesting that Ms. Levy sell clothing to her so Ms. Foster

---

[3] It is worth noting that many of Ms. Levy's business customers advertised that they had the clothing in stock, which was not true because they hadn't yet received it from Ms. Levy.

could in turn sell it to her customers.   After becoming partners, Ms. Levy and Ms. Foster were equally involved in different aspects of the business, and communicated with each other about business matters multiple times per day.  Ms. Foster testified that she herself started the Runway Renegade web-business and that Ms. Levy served as her supplier.  Ms. Foster and Ms. Levy reached a financial arrangement where they split the profits: Ms. Foster took 20% of the proceeds as being the originator of the sale; Ms. Levy took the remaining 80%, with which she purchased and shipped the merchandise, and realized a profit.

Ms. Foster testified that as the business grew, she became afraid of the aggressive actions of several of her apparel customers.  She testified that Judson Burdon, who also testified at the trial, called her in the middle of the night and in a menacing manner assured her that he knew where she lived.  Ms. Foster said that she asked Ms. Levy to deal with Burdon because Ms. Foster was afraid of him.  Ms. Foster also indicated that another customer, Mary Kate Rice, and her husband had also made threatening phone calls.  As a result, Ms. Foster and Ms. Levy began to use aliases in dealing with customers.  Ms. Foster, who used the alias Madison Morrison, explained that her and Ms. Levy's home addresses had been posted on different web sites visited by many of the apparel customers, and that Ms. Foster came to feel threatened in her own home.

Ms. Foster explained in detail how the business between her and Ms. Levy worked.  She said they communicated multiple times per day by e-mail.  They kept lists of old customers and new ones.  As Ms. Levy would send out the clothing by Federal Express, UPS, U.S. Postal Service or otherwise, she would generally send tracking information for the package to Ms. Foster, who would then pass this information to the customer.  On occasion, when a customer grew difficult to handle, Ms. Foster testified she passed them on to Ms. Levy, who would deal with them directly.

Ms. Levy maintains that while she may have used different personal names and corporate positions to make her business appear large and well-established, and a mail box in Santa Monica, California to give her apparel company a fashionable address, and while she may have made misrepresentations to potential customers in an effort to convince them that she sold authentic designer apparel (which she did), she never intended to defraud anyone out of their money. Nonetheless, there is little dispute that the business model for her companies as well as Ashley Foster's company, Runway Renegade, was deeply flawed and was founded on a premise that doomed it to failure: specifically that Ms. Levy would accept apparel orders and payment, and would then endeavor to satisfy those orders by buying the merchandise at discount, retail stores in New York City. The inevitable result of this business model is that Ms. Levy often was unable to timely satisfy the orders, causing her to either refund the money, or send substitute goods with the consent or begrudging consent of the customer, or bide time, often by making false representations regarding the reasons for delay, in order to locate and purchase conforming goods. The trial evidence shows that in regard to five customers (one of whom was an undercover FBI agent), Ms. Levy did not satisfy an apparel order for which payment was made.

## POINT ONE

Admission of Evidence Concerning The Losses Suffered by Non-Testifying Victims As Well As the E-Mail Correspondence From Certain Victims Violated Defendant's Right To Confrontation Under the Sixth Amendment

The prosecution admitted about a hundred pages of e-mail transmissions (Exhibit 31), over objection, of nine people[4] stating, in substance, that Ms. Levy failed to send them merchandise for which they paid. The Government's argument for admitting these prior out of

---

[4] In total, the e-mail transmissions of ten people were in Exhibit 31. However, one of those people – Claire Stancarone – ended up testifying at the trial. So, her e-mails would not be inadmissible hearsay or admitted in violation of the Sixth Amendment.

court statements was that the victim's e-mail statements were required to put into context the defendant's admissions, and that such were not offered for the truth.  Defendant objected on the grounds that such constituted inadmissible hearsay, that such violated her Sixth Amendment right to confrontation, and that the statements of these non-testifying individuals were unduly prejudicial under Rule 403.[5]  In addition to the e-mail transmissions, the Government elicited testimony from Special Agent Greg Ryan of the FBI concerning losses suffered by individuals other than the five victims testifying at the trial, and put into evidence a list of 45 purported fraud victims (Exhibit 30).  The basis for the agent's knowledge was hearsay, as was the basis for Exhibit 30, and by admitting such evidence, without the direct testimony of the actual victims of this fraud, the Government violated defendant's Sixth Amendment right to confrontation.

Defendant now respectfully requests that the Court set aside the jury's verdict on the grounds that admission of these e-mail transmissions (Exhibit 31), as well as Special Agent Ryan's testimony, and Exhibit 30, concerning losses suffered by other victims constituted error.  See United States v. Brown, 767 F.2d 1078 (4th Cir. 1985).  In Brown, an FBI agent testified as to conversations he had with others concerning the defendant's guilt of a certain offense.  For instance, the agent there testified that he had spoken with an informant, with police officials, and with other witnesses to certain relevant events; the agent then recounted or summed up these conversations in his testimony.  As it did here, the Government in Brown argued that the statements were not hearsay because they were not being admitted for their truth.  Also, as happened here, the trial court in Brown gave a limiting instruction to the jury that they were not to consider the statements for the truth but as to background.  The Fourth Circuit vacated the conviction and remanded the matter, saying "we are of opinion that the limiting instructions of

---

[5] Defendant also raised an objection to these e-mails in pre-trial motions and requested a pre-trial hearing to examine the 6th Amendment and hearsay implications of admitting this evidence.

the trial court were insufficient to dispel the resulting prejudice from the introduction of needless hearsay evidence…" Id. At 1084.

This case is similar to Brown and should lead to the same result: the vacating of the conviction.   In this case, the Government crafted a fraud indictment that was unclear in the scope and breath of the fraud scheme it charged; the Government then admitted, over defendant's objection, e-mail transmissions by nine uncalled, unsworn "victims" of Ms. Levy's alleged fraud, such that a Sixth Amendment violation was practically unavoidable.  The jury had no choice but to conclude that the 44 victims of fraud referred to in the indictment included these nine victims who complained about Ms. Levy in the e-mails.  Therefore, the jury would invariably view these statements by these 9 fraud victims as being offered for the truth, regardless of the court's instruction that they not consider it as such.  For this reason, the admission of this prejudicial hearsay was error, serving to violate defendant's Sixth Amendment right to confrontation.  Accordingly, the convictions should be set aside.

POINT TWO

Ms. Levy's Sentence Should Be Based Only On Facts Found by The Jury

Evidence was presented to the jury, and the jury found, that five customers ordered and paid for merchandise that they did not receive, and that such was the product of fraud.  Each of these customers testified in open court that he or she (1) ordered merchandise, (2) provided payment to Ms. Levy for such merchandise, and (3) did not receive either all or some of the merchandise he or she ordered.  There is no reliable, legally-admissible evidence that any customer aside from the five individuals who testified at the trial lost money, detrimentally relied on an allegedly false representation or was a victim of a fraud.

This Circuit has a well-recognized history of scrupulously abiding by the Sixth Amendment provision that a defendant's conviction and extent of punishment should be in accordance with those facts found by a jury of a defendant's peers.  See generally United States v. Ebersole, 411 F.3d 517 (4th Cir. 2005); United States v. Collins, 401 F.3d 212 (4th Cir. 2005); United States v. Washington, 398 F.3d 306 (4th Cir. 2005); United States v. Hughes, 401 F.3d 540 (4th Cir. 2005)(Hughes II); United States v. Hughes, 396 F.3d 374 (4th Cir. 2005)(Hughes I). The decision in Hughes I is instructive.  There, the sentencing court imposed a 46 month sentence when the guideline range authorized by the jury finding was a 6 to 12 month sentence. The Fourth Circuit found that the sentencing judge plainly erred by imposing a sentence in excess of the maximum justified by the jury finding alone. Id. at 376.   The fact that the sentencing guidelines have been rendered advisory in United States v. Booker, 543 U.S. 220 (2005) does not change the pure Sixth Amendment analysis.  Given the huge disparity between the loss found by the jury and that urged by the Government, as well as the lacking in credible evidence substantiating the Government's theory of loss at sentencing, the Court is encouraged to sentence defendant only in accordance with those facts found by the jury.

The jury found only that five customers were defrauded.  Conversely, the Government did not prove, and the jury was not asked to find, that Ms. Levy engaged in a scheme to defraud 44 persons of over $85,044, as set forth in the indictment.  The Court will recall that at oral argument following defendant's motion to dismiss the indictment as unconstitutionally vague, the court questioned the indictment as being inconsistent in that it claimed loss of $85,044 by 44 victims while naming only six victims and a total loss of $19,000.[6]   The Government made clear

---

[6] The motion asserted, "…the indictment is vague because the nature of the fraud and of the alleged misrepresentation underlying it are entirely unclear. The Indictment alleges that over 44 victims were defrauded of over $85,044, but a review of the indictment reveals six victims, three

9

that it would not produce evidence from any victim of fraud aside from the ones who testified at the trial. Given the vagueness of the indictment and the fact that the jury only heard competent, legally-admissible evidence of loss from five people, the jury's verdict justifies a sentence based only on the loss suffered by the victims who actually testified at the trial.

1.    The Conduct Found By The Jury Leads to a Range of 8-14 Months

The only sentencing calculation supported by the jury's verdict starts with a base offense level of 7; this level would be increased by 4 levels because the total loss of the offense of conviction was $27,211. Moreover, there would be no increase for number of victims, which is 5; nor should there be an increase for a fraud committed through sophisticated means, as will be addressed below. Accordingly, the adjusted offense level is level 11, at a Criminal History Category of I, for a range of 8 to 14 months in Zone C. This is the only sentencing calculation justified by the trial evidence, and by the facts actually found by the jury.

Although the pre-sentence investigation report provides that Ms. Levy defrauded a total of 45 victims out of $120,426 (the Government claims the total number of victims is 83), under the particular facts of this case, the Court is respectfully requested to conduct a guidelines analysis consistent only with those facts actually established at the trial and found by the jury.

---

of whom were together on one transaction, and a total loss of $19,000…Therefore, the fraud scheme underlying all seven counts is unconstitutionally vague in that the number and identity of the customers allegedly defrauded, as well as the nature of the fraud upon them are impossible to discern." Defendant's Motion, Document 37, Filed 2/1/08, p's 5 and 6.

2. The Government Has Not Proven By a Preponderance of the Evidence that Ms. Levy Defrauded Anyone Aside from the Five Victims Who Testified At the Trial, Or That Such Other Persons Lost a Certain Amount <u>of Money As a Result of Fraudulent Conduct</u>

No information has been provided to defense counsel as to how the probation department reached the conclusion that a total of 45 victims were defrauded out of $120,426, nor of how the Government asserts that 83 victims were defrauded out of that same $120,426 figure. Aside from the five victim-witnesses referred to above, no one else testified at the trial that he or she was a fraud victim. Moreover, it is not expected any of these alleged victims will testify at the sentencing hearing, nor is there any sworn testimony, affidavits or statements of any type by these individuals that they were defrauded or lost money or property. Therefore, there is no proof by a fair preponderance of the credible evidence substantiating the loss figure urged by the Government or the Probation Department.

As far as the Government's figure of 83 victims is concerned, this appears to be based on nothing more than complaints to a website that as of a certain date, certain merchandise hadn't been received. Counsel is aware of no precedent where a mere business complaint by a private citizen is the equivalent of proof by a preponderance of the credible evidence.[7] Also, an internet complaint is inherently unreliable because the customer complains when he hasn't received the

---

[7] A review of the internet reveals complaints of almost every imaginable type being leveled at almost every sort of business establishment. A small sampling is as follows: for complaints about Dell: http://www.my3cents.com/showReview.cgi?id=21116 http://www.complaintsboard.com/complaints/dell-notebook-c14354.html http://www.ripoffreport.com/reports/0/075/RipOff0075444.htm For complaints about Home Depot, Walmart, Netflix: http://www.measuredup.com/?gclid=CLXK0-v2yZMCFR-uQAodKSiWiw For complaints about Ford Dealerships ( and any other businesses here): http://www.ripoffreport.com/. GM Complaints: http://www.complaints.com/2007/may/2/GM_Hummer_H3_Customer_Service_144303.htm.

product and then forgets to remove the complaint once he has. So, the Government's entire protocol of establishing loss amount and number of victims is faulty and unreliable. Insofar as the pre-sentence investigation report is based on this same government protocol, such is equally unreliable.

A.    No Proof Has Been Offered That The Total Loss Figure<br>Was Caused By Fraudulent Conduct

The Fourth Circuit, as with all circuit's addressing the issue, has held that relevant conduct, under Sentencing Guideline 1B1.3, is limited to criminal conduct. <u>United States v. Dove</u>, 247 F.3d 152 (4th Cir. 2001)(reversing where defendant's sale of over 100 black bear gall bladders did not violate Virginia law because the conduct took place outside of Virginia.). The Fourth Circuit in <u>Dove</u> held that conduct that is not proven to be illegal can not be considered relevant conduct.

Other circuits considering the issue have held the same way. In <u>United States v. Schaefer</u>, 291 F.3d 932 (7th Cir. 2002) the Seventh Circuit reversed a fraud calculation, noting, "the government failed to prove that any of the losses incurred by Schaefer's customers were the result of criminal conduct, and therefore these losses cannot be considered relevant conduct under the Sentencing Guidelines." <u>Id</u>. at 937. In <u>United States v. Peterson</u>, 101 F.3d 375 (5th Cir. 1996), the Fifth Circuit held that "for conduct to be considered 'relevant conduct' for the purpose of establishing one's offense level that conduct must be criminal." <u>Id</u>. at 385. In <u>United States v. Dickler</u>, 64 F.3d 818, 830 (3d Cir. 1995), the Third Circuit held that relevant conduct must be criminal. The Eighth Circuit, in <u>United States v. Sheahan</u>, 31 F.3d 595, 600 (8th Cir. 1994), held that the Government has the burden of proving by a preponderance of the evidence that defendant's conduct was criminal in nature before the district court can rely on it as relevant conduct.

The essence of fraud is a false statement that is detrimentally relied upon.  See generally United States v. Bobo, 344 F.3d 1076 (11th Cir. 2003); United States v. Regent Office Supply Co., 421 F.2d 1174 (2d Cir. 1970); United States v. Rossomando, 1998 U.S. App. LEXIS 7154 (2d Cir. April 10, 1998).  In regard to the list of victims in the probation report, there is no evidence they detrimentally relied on a false statement, or that a materially false was made to them.  In other words, there is nothing in the probation report to suggest that these individuals were lied to by Ms. Levy or by anyone else, and that they lost money or property as a result.  In the absence of establishing by competent, reliable evidence that these individuals detrimentally relied on a materially false statement, they cannot be considered fraud victims.  Therefore, they cannot be counted in the calculation of total loss.

Moreover, there is no information that even if these victims lost money or property, that such was the fault of Ms. Levy.  For instance, several of the customers listed in the PSI report reside abroad.  The government cannot establish that the foreign courier service delivering the package actually did so?  Even more problematic for the Government is the fact that several customers used "international forwarders," foreign businesses that receive a package in one country and then have it sent to another.  There is no assurance these forwarding companies do not from time to time lose packages or decide to avail themselves of their contents, especially when such may be designer jeans from the U.S.

Likewise, many U.S. customers who run small businesses keep their signature on file with the major delivery services such as Fed Ex, UPS and DHL.  This was an area explored in the trial testimony.  This allows the delivery service to place the package on the front doorstep of the business without having it signed for by an employee.  Therefore, there is no assurance that

simply because a party did not receive a package, assuming such is even proven, that no package was sent.[8]

        B.      The Government Has Not Offered Reliable Evidence
                  To Establish A Total Loss Figure That Is Higher
                  Than The $27,211 Found By The Jury

Although the pre-sentence report stated that the total loss in the offense was in excess of $120,000, the court should not adopt that figure.  See United States v. Farnsworth, 92 F.3d 1001, 1011 (10th Cir. 1996)("we repeatedly have held that a district court may not satisfy its obligation by simply adopting the pre-sentence report as its finding.").  Instead, the court must itself conducting an analysis of whether any other individuals were defrauded; and if so, how much money they lost.

The PSI report, page 7, contains a list of 45 people who were allegedly defrauded by Ms. Levy.  Setting aside the five trial witnesses, Ms. Levy disputes each of these claims.  Indeed, in many instances, the Government's own assertions are internally inconsistent.  A brief review of some of the claims will be set forth below.[9]

A.  Dugan and A. Lelasi  were sent merchandise by Federal Express.[10]

Akiko Toyota was sent merchandise through the U.S. Postal Service.

---

[8] The Court will recall that during the trial, evidence was elicited in testimony and business records that Ms. Levy sent several hundred packages by Federal Express.  In one month alone, she sent over 40 such packages.  Therefore, the opportunity for loss or theft of such packages is obviously great.  Moreover, each year the postal police makes scores of arrests of postal employees stealing valuable items from the mail stream.

[9] Several of the names are clients of Ms. Foster's and are unknown to Ms. Levy.  For some of the customers known to Ms. Levy, a brief factual recitation is provided.

[10] Counsel has subpoenaed all records from Federal Express concerning Ms. Levy's business in the hope of showing deliveries to many of the individuals set forth in the Table on page 7 of the PSI report.  However, Federal Express does not maintain records concerning package-destination several years after the transaction.  As a result, counsel did not receive any package-destination information from the Fed Ex subpoena.

Asha Vadivelu ordered jeans; she received one item and received a refund through her sister for the other item.

Cordell Quaine received a large amount of merchandise. A United States Postal Service "Customs Declaration and Dispatch Note" confirms that on or about October 14, 2004, a package was sent by Ms. Levy to Cordell Quaine. A second "Customs Declaration and Dispatch Note" shows that on August 5, 2004 a package was sent to Cordell Quaine by Ms. Levy.

Cara Sisco – received multiple packages of merchandise, as corroborated by a U.S. Postal Service Signature Confirmation Receipt, dated October 14, 2004, and by a U.S. Post Office Express Mail receipt dated September 2, 2004.

Karla Baez - an original U.S. Postal Service Delivery Confirmation Receipt shows that on July 16, 2004 a package was sent to Karla Baez at her address in San Diego, California via Priority Mail Service. In addition, other packages were sent to Ms. Baez.

Mary Kate Rice - For the following three reasons, the $6,659 in loss attributed to Mary Kate Rice is patently unreliable. First, Ms. Rice is inconsistent regarding the total amount of loss she suffered. Second, Ms. Rice actually received a large amount of merchandise, as demonstrated by the fact that she advertised such for sale on her website, Super Girl Couture. Third, Ms. Rice dealt with Ms. Foster, not Ms. Levy.

First, the loss figure is inconsistent. Mary Kate Rice is listed in the PSI Report as a victim who suffered a loss of $6,659. However, in the FBI's initial lead report the amount she claimed as her loss was $7,950. In particular, Ms. Rice reported to Loudon County Sheriff's Office Investigator Doug Taylor that she lost $7,950 in connection with

purchases she made from Ashley Foster. The third figure, provided by the Government to the defendant in discovery, was $4,954.

Second, as evidence by the merchandise for sale on her website, Super Girl Couture, Ms. Rice had received much of the merchandise she ordered and was offering such for sale on her website and on e-bay (attached as Exhibit  ).

These are but a few examples of the fact that the Government's loss calculation is unreliable. Further evidence can and will be provided at the sentencing hearing demonstrating that the Government's loss calculus is inaccurate.

<u>POINT THREE</u>

<u>MS. LEVY SHOULD NOT BE SENTENCED TO INCARCERATION</u>

Justice does not require the Court to sentence this thirty year-old housewife, mother of three, to prison. As indicated in POINT FIVE below, Ms. Levy is prepared to pay restitution to the victims[11] of her offense. Once that is done, it is respectfully submitted that society does not require her to serve a jail sentence.

Title 18, United States Code, Section 3553(a) requires that the court "impose a sentence sufficient but not greater than necessary" in light of the "nature and circumstances of the offense and the history and characteristics of the defendant," the seriousness of the offense, the need to promote respect for the law and to provide just punishment, adequate deterrence, protecting the public, rehabilitation, the kinds of sentences available, the appropriate guidelines range, the Sentencing Commission's policy statements, the need to avoid unwarranted sentencing disparities, and the need for restitution. Sec. 3553(a)(1)-(7).

---

[11] The payment of restitution is one of the sentencing factors. <u>See</u> Section 3553(a)(7).

Under the Supreme Court's decisions in <u>United States v. Gall</u>, 128 S.Ct. 586 (2007); <u>United States v. Kimbrough</u>, 128 S.Ct. 558 (2007); <u>Rita v. United States</u>, 127 S.Ct. 2456 (2007); and <u>United States v. Booker</u>, 543 U.S. 220 (2005), this court has broad discretion in fashioning an appropriate sentence under the traditional sentencing factors of Section 3553(a) under the specific facts of this case. The decision in <u>Gall</u>, 128 S.Ct. at 586 held that appellate review of a trial court's sentencing decision is based upon an abuse of discretion standard. To that end, Circuit Courts may not require "extraordinary" circumstances or use "rigid mathematical formula that uses percentage of a variance as the standard for determining the strength of justification required for a specific sentence." <u>Id</u>. at 595. The Supreme Court warned appellate courts that these tests "come too close to creating an impermissible presumption of unreasonableness." <u>Id</u>. Therefore, the court is urged to review the 3553(a) factors in fashioning a reasonable sentence that sufficient but not greater than necessary.

    1.    <u>Nature, Circumstances and Seriousness of the Offense</u>

In regard to the offense, the court is asked to look at Ms. Levy's conduct, as developed in the trial evidence. A fair reading of this evidence is that she did not set out to commit fraud. While the Government will point to the Santa Monica Post Office Box and argue to the contrary, the court is asked to draw on its own experience and conclude that many businesses use mail drops, especially in cities or locations that may give the business a desirable location. It will be recalled that she provided entirely truthful information about herself and her home address at the mailing facility, and that there was no effort to evade law enforcement or disguise her control of the business.

Also, the court is asked to consider the facts, as developed at trial, that she did in fact ship hundreds upon hundreds of parcels of clothing to customers, as shown in the bank records

admitted at trial, records of Federal Express shipments,[12] and United States Postal Service

Express Mail Receipts.[13]  In addition, Ms. Levy utilized DHL to ship to locations out of the U.S.

It is believed these records were confiscated during the search of her home, as were many other

shipping records.  Moreover, it is undisputed that she did provide many refunds[14] to customers

when she could not send conforming merchandise.   Therefore, the contention that Ms. Levy

perpetrated a single overarching scheme to defraud is belied by the physical evidence showing

extensive shipping to hundreds of customers, and by the numerous refunds she provided.

A single overarching scheme to defraud is also belied by the testimony of Ashley Foster,

who, as defendant's business partner, stated in substance that there was no such fraud.  The court

is asked to recall Ms. Foster's testimony about the system she and Ms. Levy created to identify

those orders that had not been filled in a substantial period of time.  In particular, Ms. Foster

explained that the older orders were identified as such in the e-mail correspondence between

herself and Ms. Levy.  Clearly this was done because there was an effort being made to fill these

orders.  Also, the court is asked to consider the tremendous amount of time Ms. Levy spent

trying to make this business work.  This too was the subject of Ms. Foster's trial testimony when

she stated that she and Ms. Levy spent long hours communicating between themselves and with

customers in an effort to run this business.

Despite Ms. Levy's best efforts to make the business work, it was doomed to failure for

two fundamental reasons.  First, the business model was unworkable.  As the business grew, and

---

[12] In addition to the trial testimony of S.A. Ryman supported by Ms. Levy's bank records, admitted in evidence, photocopies of federal express receipts will be provided under separate cover.
[13] Will be separately provided.
[14] Special Agent Ryman testified that his review of the records recovered during the search of Ms. Levy's home revealed that she provided many refunds to customers.  In addition, photocopies of refunds made to customers will be provided.

volume increased, Ms. Levy was not able to buy enough clothing to meet all the orders in a timely fashion. Inevitably, she fell behind, the customers grew impatient, and major problems ensued.

Second, the business was doomed because it was conducted under a number of false premises. In the end, these false premises undoubtedly led to the jury's verdict in regard to the five apparel purchasers who testified. However, Ms. Levy maintains now, as she did at trial, that these false premises were not in place in order to commit fraud. As history would show, however, these false premises merged with the problematic business model to create a situation where misrepresentations to certain individuals were made. For instance, when orders were slow in being filled, Ms. Levy bided time. The trial evidence shows that she claimed the orders were delayed because certain people were on vacation or because certain people did not act swiftly in filling an order. Those statements were not truthful; there were in fact no such other employees, and Ms. Levy made these statements to bide time until she could find the clothing called for in the order. Sometimes, she couldn't find the clothing ordered and she shipped other clothing. Customers sometimes consented to the change in arrangement and sometimes they did not. In the world of wholesale clothing sales, however, this practice is not unusual, especially between businesses. The problem with the business model, however, was that, as shown by the trial evidence, Ms. Levy ended up making excuses to justify the delay, and in so doing, may have provided false information to a customer awaiting merchandise.

This distinction is important because there is nothing in the evidence to suggest that Ms. Levy entered any business arrangement with the specific intention of taking money and not providing merchandise. It is for this reason that she persisted in a plea of not guilty and went to

trial.  In the end, the jury found she defrauded the five people who testified.  She accepts the jury's verdict.

2.      History and Characteristics of the Defendant

As mentioned above, Ms. Levy has never broken the law a day in her life until this offense.  She has only been a model parent, spouse and member of the community.  She is very involved in, and a valued member of, her religious community.  She is also highly educated and accomplished in piano, for which she has received a diploma.

Also significant is the fact that as soon as the FBI came to her house, with a search warrant, and advised her that her actions may be criminal, she immediately suspended her business.  In terms of specific deterrence, this is especially noteworthy because she had sufficient respect for the law that when it was apparent that she may have run afoul of it, she ceased her activities.  She did not wait until she was arrested, as do many defendants, before suspending the activities that led to their legal troubles.  Instead, Ms. Levy stopped conducting business from the very moment the FBI came to her home.  Therefore, the Court is asked to conclude that a sentence of incarceration is not required to deter Ms. Levy from ever again breaking the law.  Indeed, she had the presence of mind to cease her behavior even before she was arrested.

3.      Avoiding Sentencing Disparities

Ashley Foster testified that she and Ms. Levy were partners in the apparel business, that they made decisions together and shared the profits according to an agreed upon formula.  Ms. Foster has not been charged with any offense, and will never be charged with any offense.  As a result, she is receiving no punishment whatsoever despite the fact that the FBI's initial investigation focused solely on her.  As S.A. Ryman testified, the initial FBI investigation, as referred to them by the Loudon County Sheriff, was that Ashley Foster, under the alias of

Madison Morrison, was selling counterfeit clothing and committing fraud. Upon further investigation, the FBI concluded that Ms. Foster was involved in a business arrangement with Ms. Levy. At that point, it is submitted that the investigators made a decision to use Ms. Foster to provide information against Ms. Levy. The Government thereafter put Ms. Foster in the Grand Jury in an effort to further this investigation against Ms. Levy, and essentially used Ms. Foster to provide historical information about the web-businesses. However, the reason Ms. Foster was valuable to the agents was because she and Ms. Levy were involved in the same conduct.

Section 3553(a)(6) specifically instructs sentencing judges to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The fact that the Government failed to charge Ms. Foster with a crime should not alter the court's analysis in terms of disparities. In the most elementary terms, it simply is not fair to put Ms. Levy in jail while Ms. Foster escapes this investigation without being charged with a crime, much less incarcerated. The Government's handling of its investigation is especially troubling and unfair when it is realized that Ms. Foster has a criminal record for fraud and Ms. Levy does not.

For the reasons stated above, defendant contends that the court should not employ the guidelines analysis suggested by the Government or the Probation Department. However, even if the Court does so, the only reasonable sentence under Title 18, United States Code, Section 3553(a) would be a non-incarceratory sentence.

## POINT FOUR

## THIS WAS NOT A SOPHISTICATED FRAUD SCHEME

Ms. Levy objects to the PSI report providing for a two level enhancement for a fraud committed through sophisticated means. There was nothing whatsoever sophisticated about the fraud of which Ms. Levy was convicted. Simply put, Ms. Levy accepted money for merchandise, and when she was unable to provide it in a timely fashion, she made misrepresentations in order to bide time to get the clothing. The Government will undoubtedly point to the Santa Monica mailbox and the use of different names and departments within the business. However, there is no evidence to suggest these things were done with a fraudulent purpose. A fair reading of the trial evidence, especially the testimony of Ashley Foster, is that these things were done to give the business credibility as a seller of authentic apparel in a world of counterfeiters. However, there is no evidence that Ms. Levy, or for that matter, Ms. Foster, used the mailbox or the false names as a vehicle to commit fraud. Therefore, defendant challenges that aspect of the PSI where it concludes that she committed this crime through sophisticated means.

## POINT FIVE

## THE COURT SHOULD NOT ORDER FORFEITURE

Following the jury's verdict, defendant agreed to allow the Court, and not the jury, to decide the issue of forfeiture.[15] In this case, the Government is seeking a money judgment in the amount of $120,426. For the following reasons, there is simply insufficient evidence for the court to find forfeiture in this amount.

---

[15] The Government misstates in its sentencing memorandum that defendant waived her right to contest the forfeiture allegation. This is not true. Defendant merely decided to allow the Court to make this decision rather than sending the jury back to decide the forfeiture issue after rendering a verdict on the seven counts.

First, for the reasons set forth in POINT TWO above, the Government has not provided sufficient, credible evidence of loss in that amount. See United States v. Cherry, 330 F.3d 658 (4th Cir. 2003).

Second, the Government has not shown a nexus between this property and the counts of conviction to justify forfeiture under Federal Rule of Criminal Procedure 32.2.

The defendant does not object to payment of restitution in an appropriate amount, as found by the court. However, the Government has not provided sufficient evidence that defendant profited in this amount, absent the money deducted for shipping, advertising, etc. Also, to the extent that the Government relies on Exhibit 2, the charge comparing defendant's deposits and purchases, it is respectfully submitted that the integrity of such exhibit was undermined when the protocols used for its creation were further examined. For instance, the agent admitted that he included as profit wire transmissions sent to Ms. Levy from her mother in France. This totals tens of thousands of dollars over several years. Moreover, the agent only made a tally of purchases from three stores, when in fact Ms. Levy made purchases from far more than that. Indeed, the inherent problems with the chart prompted the agent to offer to rewrite it and create a new one. It is therefore submitted that this chart does not meaningfully further the Government's argument on the subject of forfeiture.

POINT SIX

If The Court Sentences Ms. Levy To A Jail Term,
She Should Remain At Liberty Pending Appeal

There is clear and convincing evidence that Ms. Levy is not likely to flee or pose a danger to the community or any person if continued on release pending appeal. Ms. Levy has scrupulously abided by her terms of release. She has come to court whenever requested to do so. She was fully complaint with her pre-trial officer and with the probation department. As a result,

there is no reason to believe that she may be a risk to flee the jurisdiction of this court or a danger to the community.

Moreover, an appeal in this matter would not be for the purpose of delay, and would involve substantial issues of law and fact, specifically those raised in POINT ONE and POINT TWO above. It is respectfully submitted that each of these issues are substantive and relate to an ongoing debate on how the confrontation clause of the Sixth Amendment relates to evidence admitted at both criminal trials and criminal sentencing. This is an issue taken up by the Fourth Circuit in various forms in the past. See generally United States v. Ebersole, 411 F.3d 517 (4th Cir. 2005); United States v. Collins, 401 F.3d 212 (4th Cir. 2005); United States v. Washington, 398 F.3d 306 (4th Cir. 2005); United States v. Hughes, 401 F.3d 540 (4th Cir. 2005)(Hughes II); United States v. Hughes, 396 F.3d 374 (4th Cir. 2005)(Hughes I), and it is expected that the Fourth Circuit may similarly render a substantive decision in this matter on the Sixth Amendment issues raised herein. Therefore, defendant urges this Court to allow her to remain at liberty pending appeal in the event a jail sentence is imposed.

CONCLUSION

For the reasons set forth in POINT ONE, defendant requests that this Court set aside the verdict; for the reasons in POINT TWO, defendant requests that this Court sentence her solely based on the loss related to the seven counts found by the jury; for the reasons in POINT THREE, she asks this court to not impose an incarceratory sentence; for the reasons in POINT FOUR, the court should not find this was a sophisticated fraud scheme under the guidelines; for the reasons in POINT FIVE, the court should not order forfeiture; and for the reasons in POINT SIX, if the court does impose an incarceratory sentence, Ms. Levy should be permitted to remain at liberty pending appeal.

Respectfully submitted,


Dated: June 6, 2008                By:  _/s/ Sarah E. Moffett

                                   Sarah E. Moffett (VSB No. 72208)
                                   LeCLAIRRYAN, A Professional Corporation
                                   225 Reinekers Lane, Suite 700
                                   Alexandria, Virginia  22314
                                   Telephone:     (703) 647-5930
                                   Facsimile:      (703) 647-5980
                                   Sarah.Moffett@leclairryan.com
                                   *Counsel for Defendant Ingrid Levy*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF, which will then send a notification of the filing to the following:

Jay V. Prabu
Attorney for the United States of America
U.S. Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Phone: 703.299.3700
Facsimile: 703.299.3981
E-mail: jay.prabhu@usdoj.gov


This filing will be submitted by other means to the following:

Jennifer D. Lyerly
U.S. Probation Officer
(703) 366-2100


By: _/s/ Sarah E. Moffett
Sarah E. Moffett (VSB No. 72208)
LeCLAIRRYAN, A Professional Corporation
225 Reinekers Lane, Suite 700
Alexandria, Virginia 22314
Telephone:     (703) 647-5930
Facsimile:     (703) 647-5980
Sarah.Moffett@leclairryan.com
*Counsel for Defendant Ingrid Levy*