IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:07 CR 265 |
| | ) | |
| INGRID DINA LEVY, | ) | Hon. James C. Cacheris |
| | ) | |
| | ) | <u>Sentencing:</u> June 12, 2008 |
| Defendant. | ) | |

**THE UNITED STATES OF AMERICA'S RESPONSE
TO DEFENDANT'S SENTENCING MEMORANDUM**

COMES NOW, the United States of America, through its attorneys, Chuck Rosenberg, United States Attorney, and Jay V. Prabhu, Assistant United States Attorney, and responds TO the Defendant Ingrid Dina Levy's Sentencing Memorandum, which was filed on Friday, June 6, 2008 at 4:43 PM. None of the Defendant's arguments on the law and Sentencing Guidelines have merit; her mischaracterization of the facts adduced at trial has been soundly rejected by the jury's verdicts; her attempts to avoid a money judgment to satisfy her victims' losses stands in stark contrast to the requirement that full victim restitution be made; and her sentencing requests amount to a nullification of her seven convictions following a trial before a jury. They should all be rejected, and the Defendant should be sentenced within the advisory Sentencing Guidelines range of 46 - 57 months and a money judgment entered for the full amount of the victims' losses for the reasons herein and in the government's previously filed memoranda, especially the Position of the United States on Sentencing Factors.

ARGUMENT

I.      THE COURT SHOULD NOT LIMIT ITS REVIEW UNDER 18 U.S.C. §§ 3553 AND
        3661 TO THE DEFENDANT'S MISCHARACTERIZATION OF THE FACTS
        ESTABLISHED AT TRIAL AND INSTEAD SHOULD CONSIDER ALL OF THE
        FACTS BEFORE IT IN DETERMINING AN APPROPRIATE SENTENCE

        A.      The Defendant's Proposed Standard of Review for the Court's Sentencing
                Determination Has No Basis in Law

        The Defendant improperly suggests that the Court may only consider the losses of the

five victims who testified at trial in determining its sentence.  See Defendant's Sentencing

Memorandum at 10 ("the Court is respectfully requested to conduct a guidelines analysis

consistent only with those facts actually established at the trial and found by the jury.")  Putting

aside for the moment the "facts" the Defendant claims were established at trial, no statutory or

other legal basis is provided by the Defendant to justify artificially limiting the Court's review in

determining a sentence for the Defendant.  This is not surprising since 18 U.S.C. § 3661

explicitly provides:

        No limitation shall be placed on the information concerning the background, character,
        and conduct of a person convicted of an offense which a court of the United States may
        receive and consider for the purpose of imposing an appropriate sentence.

See also United States v. Falesbork, 5 F.3d 715, 722 (4th Cir. 1993) ("the broad scope of

information that 18 U.S.C.  § 3661 permits a sentencing judge to consider."); accord United

States v. Booker, 543 U.S. 220, 235 (2005) (mandatory nature of Guidelines violates Sixth

Amendment; however, "advisory" Guidelines with less exacting appellate review for

"unreasonableness" are unconstitutional, emphasizing breadth of information-in addition to

Guidelines-a district judge may consider at sentencing).

In fact, post-Booker, with the mandatory use of the Guidelines removed, the Sixth Amendment "will not impede a sentencing judge from finding all facts relevant to sentencing." United States v. Mares, 402 F.3d 511, 519 (5th Cir.), cert. denied , 126 S.Ct. 43 ( 2005) (citing Booker, 125 S.Ct. at 750, 764); see also United States v. Hughes, 401 F.3d 54 (4th Cir. 2005) ("a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines."); United States v. Malveaux, 411 F.3d 558, 560 n.9 (5th Cir. 2005) (recognizing that it is a direct contradiction of Mares to contend that "Booker prohibits a judge from finding any facts used to enhance a sentence" ). It is apparent that facts relevant to sentencing include relevant conduct under U.S.S.G. § 1B1.3. See United States v. Duncan , 400 F.3d 1297, 1305 (11th Cir. 2005) (holding that Booker allows a sentence to be calculated based upon relevant conduct of which the defendant was acquitted). See also United States v. Pontier, 2005 WL 3105648 (4th Cir. Nov. 21, 2005) (unpublished) (holding that the district court did not err by using the amount of drugs reasonably attributable to the defendant to calculate the post-Booker sentencing range).

In fact, the United States Sentencing Guidelines Section 1B1.3(a)(2) requires for fraud offenses that the offense level under the Guidelines reflect "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." In consideration of such "relevant conduct," it makes no difference if the other criminal conduct is charged in the count of conviction, or even that the crimes were dismissed, or even that the defendant was acquitted of the counts. See, e.g., United States v. Watts, 519 U.S. 148, 155-56 (1997) (acquitted conduct); United States v. Ellis, 975  F.2d 1061 (4th Cir. 1992) (dismissed count); United States v. Bowman, 926 F.2d 380, 381-82 (4th Cir. 1991) (uncharged crimes).  All

that is required is that the relevant conduct is "part of the same course of conduct or common scheme or plan as the offense of conviction." See, e.g., United States v. Mullins, 971 F.2d 1138, 1145-46 (4th Cir. 1992).

In determining "relevant conduct," the district court may consider any relevant and reliable evidence before it, including hearsay. Bowman, 926 F.2d at 381; United States v. Wilson, 896 F.2d 856, 858 (4th Cir. 1990) (sentencing judge not restricted to information which would be admissible at trial, but may consider any reliable information); USSG § 6A1.3; see also United States v. Love, 134 F.3d 595, 607 (4th Cir.), cert. denied, 524 U.S. 932 (1998) ("there is no bar to the use of hearsay in sentencing. ... The trial court may properly consider uncorroborated hearsay evidence that the defendant had an opportunity to rebut or explain.").

B.      The Defendant's Relevant Conduct Includes Harm to More than 50 Victims, Losses of More than $120,000, and Conduct Involving Sophisticated Means

The evidence at trial showed through business records of bank and credit card accounts that the Defendant had revenues from her fraudulent scheme in excess of half a million dollars. These non-hearsay records were entered into evidence primarily as Government Exhibits 1, 14, 15, 16, 17, 18, 19, and 20. Special Agent Greg Ryman examined those records and created Government Exhibit 2, which summarized deposits into the account of the Defendant as well as purchases from the retail stores from which the Defendant claimed she bought her product. The Court will recall that defense counsel questioned the methodology used by Agent Ryman to prepare the summary at some length, and the testimony was clear that the summary accurately reflected the non-hearsay records reviewed by Agent Ryman.

Agent Ryman further testified that there were a number of complaints about the

Defendant from the Internet Crime Complaint Center ("IC3"). The fact that complaints were made is fact testimony, not hearsay. Agent Ryman did not testify about the specific allegations of these complaining individuals, and the government did not seek to admit their complaints into evidence (though they have now been provided to the Court, the Probation Officer, and the defense). Agent Ryman did, however, examine the non-hearsay business records of the Defendant to see if any of these persons paid the Defendant any money. The results were summarized in Government Exhibit 30, which listed names and amounts of money paid to the Defendant. Agent Ryman, again, was queried on both direct and cross examination about how he prepared Exhibit 30 and it was properly entered into evidence as a summary of his findings.

Exhibit 30 lists 46 persons who paid money to the Defendant's clothing business accounts. The total of $120,426 .16 was simply a summary of the funds transferred to the Defendant. Those were the numbers used by the Probation Officer to prepare the Presentence Report. The government submits that this is the minimum amount of persons and loss that the Court should include in its sentencing considerations.

1)      The Court has Sufficient Evidence Before It To Conclude that there
        Were More Than 50 Victims of the Defendant's Scheme

The Defendant complains that only 5 victims testified in the case (including an FBI agent who was bilked out of over $1,000 by the Defendant), and therefore only those victims may be considered by the Court. Section 1B1.3(a)(2) of the Sentencing Guidelines, however, requires that the Court consider "all acts and omissions ... that were part of the same course of conduct or common scheme or plan as the offense of conviction." Obviously, other victims who did not testify at trial but paid the Defendant significant sums of money and did not receive all of the

products that they ordered from her are "relevant conduct" that the Court should consider. The

IC3 complaints are hearsay, but can certainly be considered by the Court in crafting its sentence.

See, e.g., United States v. Bowman, 926 F.2d 380, 381 (4th Cir. 1991); United States v. Wilson,

896 F.2d 856, 858 (4th Cir. 1990). To ignore victims simply because the government did not

have the resources to call them all would be counter to both the law and the interests of justice.

It is notable that 83 persons have indicated that they were victims of the Defendant's

fraudulent clothing scam, and many of these persons also reported the Defendant or the

associated entities to the Better Business Bureau in their home localities or the places where they

believed that the Defendant's businesses were located. The Defendant counters that she has

shipping records showing at least one package went to several of these customers. See

Defendant's Sentencing Memo, at 14-15. As the Court may recall from the trial, sending

packages of non-conforming goods or creating false shipping records were part of the

Defendant's scheme, and therefore the Defendant's current claims should be given no significant

weight. The testimony from Special Agent Ryman was that he could find no evidence that a

single customer of the Defendant received the entirety of their order. The Defendant, though

under no obligation to do so, has not provided any credible evidence to the contrary.

It is also important to remember that these are merely the customers of the Defendant

who contacted IC3. With the amount of money taken in by the Defendant's business, there are

likely hundreds of victims who have given up their hopes of getting their money back from the

Defendant. Again, the Defendant, though under no obligation to do so, has not provided a single

satisfied customer who received the entirety of the order for which they paid the Defendant.

The emails contained in Government Exhibit 31 are instructive because they show the manner by which the Defendant did "business" as part of her fraudulent scheme and that the five victims who testified were not "cherry-picked" by the government as indicated in the defense's opening statement at trial. The manner and means of the Defendant's fraudulent scheme is clear: Misrepresent the type of business she was operating; say anything to get the victim to send in as much money as she could; cash the victim's check or wait for the wire to clear; stall the victim by email after email from entity after entity; wait out the victim; and, most importantly, keep the money.

The evidence is overwhelming that there were far more than 50 victims of the Defendant's criminal scheme, and, therefore, the government respectfully objects to the Probation Officer's conclusion that there were less than 50 victims.

> 2) The Court has Sufficient Evidence Before It To Conclude that there Were Losses of More than $120,000 from the Defendant's Scheme

The Defendant further posits that only the losses attributable to the 5 victims who testified in the case (approximately $27,000) may be considered by the Court. Again, the Court is not required to stick its head in the proverbial sand and ignore evidence of the Defendant's overall illegal scheme.

The Court is certainly not limited to those five victims, but may look to other "relevant conduct" associated with the Defendant's scam. The case of United States v. Photogrammetric Data Services, 259 F.3d 229, 257-59 (4th Cir. 2001), cert. denied, 535 U.S. 936 (2002), is instructive. There, the counts in the indictment charged false invoices totaling approximately $19,000, but the defendant was sentenced to a term of imprisonment based on a calculated loss of

over $435,000. The Fourth Circuit affirmed, finding no violation of due process generally or of the U.S. Supreme Court's ruling in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). The Fourth Circuit found that where sentences are "within the statutory maximum sentences for the offenses of conviction, and no other exceptional circumstances are apparent to counsel a different result," the amount of loss is still properly determined by the sentencing judge by a preponderance of the evidence. Photogrammetric Data Services, 259 F.3d at 259 (citing and discussing cases from the First, Fourth, and Eighth Circuits).

Again, the Court should consider both the testimony and evidence at trial, which showed the Defendant had revenues of over $500,000 as part of her scheme and the $120,426 in payments to the Defendant by 45 persons who had filed complaints with IC3. The Court, at sentencing, may also consider all the claims of the 83 victims identified by IC3 and the $169,274 in loss that they document. The government would encourage the Court to read through their complaints, and submits that it will become clear from their descriptions of the Defendant's conduct in the particular cases are part of the Defendant's overall fraudulent scheme. The government submits that there is at least $120,426 in losses attributable to the Defendant, and believes that the evidence before the Court supports the finding that there was $169,274 in victim losses.

> 3)  The Court has Sufficient Evidence Before It To Conclude that the Defendant Used Sophisticated Means as Part of Her Scheme

The Presentence Report for the Defendant found that the Defendant committed fraud through "sophisticated means." This is proper under USSG Section 2B1.1(b)(9)(C). In the commentary for this section, the Sentencing Commission provides a definition of the

"Sophisticated Means Enhancement":

> For purposes of subsection (b)(9)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Looking at the evidence that came out in trial, it is clear that this enhancement applies to the Defendant. Among other actions, she used multiple websites, dozens of electronic mail addresses, and dozens of fake names; she set up addresses in Virginia (through Ashley Foster Frye) and in California (through a mailbox service) that made it appear her business was located in jurisdictions other than Brooklyn, New York; she used phone numbers to disguise her location; she created documents (invoices, applications, and other notices) to make it look like she was a legitimate authorized wholesaler of high fashion clothing; she used a tangle of shipping records to try to convince her victims that their product was shipped when it had not; and she created dozens of false entities to support her fraudulent scheme including a fake law firm that sent out threatening letters to Internet forums that contained warnings about her operations and customers who complained too much. Layer after layer of deception was created by the Defendant using all the tools that modern technology allows, and they were all designed to gain the trust of potential customers and then keep their money. The sophistication of the Defendant's operation is obvious and tracks the language of the definition in the Sentencing Guidelines closely, and therefore the "sophisticated means" enhancement was properly applied by the Probation Officer.

II.     NO DEPARTURE FROM THE ADVISORY SENTENCING GUIDELINES RANGE IS
        JUSTIFIED BY THE FAMILY SITUATION OF THE DEFENDANT

"[F]amily ties and responsibilities are not ordinarily relevant in determining whether a

departure may be warranted."  USSG § 5H1.6.  As family ties are a discouraged factor, the Court

"should depart only if the factor is present to an exceptional degree or in some other way makes

the case different from the ordinary case where the factor is present."  Koon v. United States, 518

U.S. 81, 96 (1996).

Here, the Defendant claims that she "she has devoted her adult life to spending time with,

raising, helping and working with children."  Defendant's Sentencing Memo, at 1.  There is no

doubt that a sentence of incarceration will affect the Defendant's relationships with her children.

But there is absolutely nothing exceptional about family relationships such as that described by

the Defendant.  See, e.g., United States v. Wilson, 114 F.3d 429, 433-34 (4th Cir. 1997) (fact that

defendant "rose above his [disadvantaged upbringing" to care for his own children not

sufficiently "extraordinary" to support downward departure).  Accord Elliot v. United States, 332

F.3d 753, 768-69 (4th Cir.) (defendant's being primary caregiver to chronically ill husband not

sufficiently "extraordinary" to support downward departure), cert. denied, 590 U.S. 991 (2002);

United States v. Rybicki, 96 F.3d 754, 759 (4th Cir. 1996) (defendant's responsibility for wife and

son, both with medical problems, insufficient basis for downward departure); United States v.

Weddle, 30 F.3d 532, 540-41 (4th Cir. 1994) ("a defendant's status as a single custodial parent"

insufficient basis for departure."); United States v. Brand, 907 F.2d 31, 33 (4th Cir. 1990)

(finding that the "sole, custodial parent is not a rarity in today's society, and imprisoning such a

parent will by definition separate the parent from the children.").  The problems described by the

Defendant are problems millions of families have every day. That, in itself, is not sufficient to ignore the jury's verdicts and the harm done by the Defendant's illegal scheme.

According to the testimony at trial, the Defendant used her fraudulent scheme to financially benefit her children. First, many of the purchases of clothing that she claimed showed she was buying clothing to fulfill customer orders were, in fact, children's clothing (which the evidence showed she did not sell). Buying high fashion clothing for your children with stolen money does nothing to lessen the impact on her victims or ameliorate her actions. Second, the Defendant's husband testified that the Defendant paid for special and very expensive schooling for their son who has a learning disability using funds from her clothing business. Again, while this may be a positive contribution to the health and life of their son, illegal conduct cannot be excused because the stolen money may be used in potentially positive way. Such considerations will generally lead to anarchy, as nearly every Defendant will be able to rationalize illegal conduct by doing something positive with their illegal proceeds.

Simply put, the Defendant "has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts [familial] relationships." United States v. Cacho, 951 F.2d 308, 311 (11th Cir. 1992) (citation omitted). As a result, the Defendant has not offered any permissible justification for a downward departure and has certainly not shown her situation is extraordinary. To treat her differently on the basis of this record would defeat the principle of consistent sentencing.

III. THE DEFENDANT HAS SHOWN ABSOLUTELY NO REMORSE AND CONTINUES TO RAISE THE SAME EXCUSES INTRODUCED BY COUNSEL AT TRIAL WHICH WERE SOUNDLY REJECTED BY THE JURY'S SEVEN GUILTY VERDICTS

In their Sentencing Memorandum, defense counsel continually raises arguments and excuses that were raised at trial, and were rejected by the seven convictions of fraud returned by the jury. For example, "Ms. Levy maintains now, as she did at trial, that these false premises were not in place in order to commit fraud. ... [T]here is nothing in the evidence to suggest that Ms. Levy entered into any business arrangement with the specific intention of taking money and not providing merchandise. ... [Ms. Levy made her] best efforts to make the business work ... [S]he did not set out to commit fraud. ... The inevitable result of this business model is that Ms. Levy often was unable to timely satisfy the orders, causing her to either refund the money, or send substitute goods with the consent or begrudging consent of the customer, or bide time, often by making false representations regarding the reasons for delay, in order to locate and purchase conforming goods. " Defendant's Sentencing Memo at 6, 17-19. Rather than accept these excuses, the jury determined that the Defendant had an intent to defraud and found her guilty on seven separate counts. To continue to make these assertions, through counsel, despite the jury's verdicts is indicative of the failure of the Defendant to feel any remorse for her conduct and feel any responsibility for her actions.

IV. THE DEFENDANT IMPROPERLY SUGGESTS THAT ASHLEY FOSTER FRYE WAS SIMILARLY SITUATED TO HER AND A FAILURE TO CHARGE MRS. FRYE REQUIRES NULLIFICATION OF THE SEVEN CONVICTIONS OF THE DEFENDANT

The Court will recall that the Defendant had arranged with a woman in this District

named Ashley Foster Frye to work together on websites called Bubblepopshop and Runwayrenegade. The arrangement was that Mrs. Frye would take orders for high fashion clothing and the Defendant would fill them. The testimony of Mrs. Frye was that she was told by the Defendant that all orders had been satisfied from Runwayrenegade, but that she had no personal knowledge if they had actually been satisfied. She was also told by the Defendant that all the customers from Bubblepopshop got credit card refunds ("chargebacks") and that they were all lying because she had shipped all their orders. The Defendant had also told her that she had fashion clothing stores, and that she was selling excess inventory. When she finally challenged the Defendant about shipping, Mrs. Frye found that the tracking numbers provided to her by the Defendant in response were often to other names and places than the orders to which they were supposedly related. In sum, Mrs. Frye was an unwitting participant in the Defendant's fraudulent scheme. She was basically a mailbox to protect the Defendant's identity from her victims; her role in isolating the Defendant from discovery was much like the fake phone numbers, the fake email addresses, and the mailboxes in California. Although the Defendant purported to be a close friend of the Mrs. Frye, the Defendant used Mrs. Frye for her identity and her gullibility. The treatment of Mrs. Frye by the Defendant should, if anything, be an aggravating factor against the Defendant.

V.     FORFEITURE IS MANDATORY AND THE COURT SHOULD ISSUE A MONEY
        JUDGMENT IN ITS DECISION

Criminal forfeiture of proceeds obtained from the mail fraud and wire fraud offenses is mandatory as both offenses are "specified unlawful activities" making the proceeds thereof forfeitable civilly under 18 U.S.C. § 981(a)(1)(C) and criminally under 28 U.S.C. § 2461(c). The

pertinent part of 28 U.S.C. §2461(c) states that "[i]f the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case".

In this case, the Court should order a money judgment in the amount it finds is the loss resulting from the Defendant's conduct. The amount should be at least $120,426.16. If the Court finds that the loss is higher ($169,274, for example), the government believes it would be appropriate to issue restitution and a money judgment in that amount.

VI.     THE DEFENDANT'S CONDUCT DEMANDS A SIGNIFICANT PERIOD OF
        INCARCERATION

By asking for a period of probation, the Defendant shows how little this case and this experience have affected her. The message that would be sent by a significant reduction of her sentence to her is to undermine the jury's verdicts and vindicate her strategy of keeping the money from her scheme at all costs and wait her victims out. The message that would be sent by a significant reduction of her sentence to the rest of the world is that Internet fraudsters should take the chance: fraudsters should initiate schemes because the chance of being caught is small; the chance of being convicted somewhat smaller; and the chance of being punished severely even less. When that is weighed against the hundreds of thousands of dollars, if not millions, made available by Internet technology, there is every reason for them to do the wrong thing. The government asks the Court to take a stand against Internet fraud and send a message of deterrence.

V.    CONCLUSION

The United States encourages the Court to consider all of the evidence presented at trial, the investigation completed by the Probation Office and presented in the Presentence Report, and the arguments and submissions of the parties.  At the end of that review, the United States submits that the Defendant should be sentenced within the advisory Sentencing Guidelines range of 46-57 months, a money judgment for the full amount of the victim losses be entered, and an appropriate fine be levied.

                                        Respectfully submitted,

                                        Chuck Rosenberg
                                        United States Attorney


                        By:        _____/s/_____
                                        Jay V. Prabhu
                                        Attorney for United States
                                        U.S. Attorney's Office
                                        Justin W. Williams U.S. Attorney's Building
                                        2100 Jamieson Avenue
                                        Alexandria, Virginia 22314
                                        703-299-3842
                                        Fax: 703-299-3981
                                        jay.prabhu@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of June, 2008, I will electronically file the foregoing with the Clerk of Court using the CM/ECF, which will then send a notification of such filing (NEF) to the following:

Steven D. Brown
Sarah E. Moffett
LeCLAIR RYAN, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, 8th Floor
P.O. Box 2499
Richmond, Virginia 23218-2499
Telephone: (804) 783-7516
Fax: (804) 783-7616

Steven.Brown@leclairryan.com
Sarah.Moffett@leclairryan.com

Counsel for Ingrid Dina Levy

       /s/
Jay V. Prabhu
Attorney for United States
U.S. Attorney's Office
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
FAX: 703-299-3981
Email Address: jay.prabhu@usdoj.gov